STATE OF MISSOURI at the relation of LLOYD GAINES, Appellant, v. S. W. CANADA, Registrar of the University of Missouri, and the CURATORS OF THE UNIVERSITY OF MISSOURI, a Body Corporate.— 113 S. W. (2d) 783.

Court en Banc, February 25, 1938.

122

*Sidney R. Redmond, Henry D. Espy* and *Charles Houston* for appellant.

*Fred L. Williams, Nick T. Cave, William S. Hogsett* and *Ralph E. Murray* for respondents.

FRANK, J.—Action in mandamus to compel the registrar and the curators of the University of Missouri to admit relator, a negro, as a student in the School of Law in the University of Missouri. The action was tried in the Circuit Court of Boone County. On final hearing the alternative writ was quashed and a peremptory writ was denied. Relator appealed.

The unchallenged pleadings sufficiently present the issues urged on this appeal.

Appellant, a young man twenty-five years of age, is a citizen of Missouri, and resides in the City of St. Louis. He was educated in the public schools maintained by the State for the education of negroes including education in the common school, high school and Lincoln University. He was graduated from the Lincoln University in August, 1935, with an A.B. degree, and thereupon made application for admission as a student in the School of Law in the University of Missouri. Respondents denied such application on the ground that it is contrary to the Constitution, laws and public policy of the State to admit a negro as a student in the University of Missouri.

Other necessary facts will be stated in connection with the questions discussed.

At the trial below, it was admitted that appellant's work and credits at the Lincoln University would qualify him for admission to the School of Law of the University of Missouri if he were found otherwise eligible.

Appellant contends that the Constitution, laws and public policy of the State entitled him to admission as a student in the Law Department of the University of Missouri.

Section 3 of Article XI of the Constitution of Missouri provides as follows:

"Separate free public schools shall be established for children of African descent."

Section 9216, Revised Statutes 1929, provides:

"Separate free schools shall be established for the education of children of African descent; and it shall hereinafter be unlawful for any colored child to attend any white school, or for any white child to attend a colored school."

Section 9217, Revised Statutes 1929, makes the following provision:

"When there are within any district in the state eight or more colored children of school age, as shown by the last enumeration, the board of directors of such school district shall be and they are hereby authorized and required to establish and maintain within such school district a separate free school for said colored children or in lieu thereof shall pay the transportation and the tuition charges to any district in the county wherein a school is maintained for colored children. *Provided* if the number of colored children enumerated is less than eight they shall have the privilege and are entitled to attend school in the nearest district in the county wherein a school is maintained for colored children and the transportation and tuition charges incurred shall be paid."

Without enumerating the provisions of Sections 9346, 9347, 9348, and 9349, Revised Statutes 1929, it will be sufficient for present purposes to state that such statutes provide separate high school facilities for colored students equal to those provided for white students.

The public policy of a State is evidenced by the Constitution, statutory laws, course of administration and decisions of the courts of last resort of the State. It is clear that the constitutional and statutory provisions to which we have called attention provide separate public schools for the education of colored children. In the administration of these constitutional and statutory provisions, separate schools have been established and maintained for that purpose. This court has held that the Constitution and laws of this State providing separate schools for colored children are not forbidden by, or in conflict with, the Fourteenth Amendment of the Federal Constitution, and do not deprive colored children of any rights. [Lehew v. Brummell, 103 Mo. 546, 552, 15 S. W. 765.] It follows, therefore,

that the established public policy of this State has been and now is to segregate the white and negro races for the purpose of education in the common and high schools of the State. Appellant contends, however, that the public policy of the State does not require the separation of the races for the purpose of higher education. That question we take next.

There is no express constitutional provision requiring that the white and negro races be separated for the purpose of higher education. Neither is there any constitutional prohibition against such a separation. Our State Constitution is not a grant but a limitation on legislative power, so the Legislature may enact any law not expressly or impliedly prohibited by the Federal or State Constitution. [State ex rel. McDonald v. Lollis, 326 Mo. 644, 33 S. W. (2d) 98; State ex rel. Crutcher v. Koeln, 332 Mo. 1229, 61 S. W. (2d) 750; State v. Dixon, 335 Mo. 478, 73 S. W. (2d) 385.] It must follow, therefore, that since there is no constitutional prohibition against the separation of the white and negro races for the purpose of higher education, the Legislature has authority to enact laws providing for such separation. This conclusion brings us to two questions (1) has the Legislature enacted laws providing for the separation of the two races for the purpose of higher education? and (2), if so, do such laws run counter to any constitutional provision, State or Federal?

The laws enacted by the Legislature of this State providing higher education for the negro are fairly summarized in respondents' brief as follows:

"In 1870 the General Assembly enacted a statute entitled 'An Act establishing a State Normal School for colored teachers,' wherein it was provided that 'the Lincoln Institution, at Jefferson City, is hereby constituted a State Normal School, for the purpose of training *colored teachers* for public schools' (Laws 1870, p. 136). This statute, enacted five years after the close of the Civil War, is the first statute providing higher education for negroes. This statute was carried forward as Section 7176, R. S. 1879. To this statute was added Section 7177, R. S. 1879, providing that the foregoing section 'shall not be so construed as to affect or abolish the Lincoln Institute or in anywise to interfere with the objects as contemplated by the original articles of incorporation, but said State Normal School shall be considered as a normal department in said institution for the education of colored teachers for public schools.'

"In 1887 the General Assembly enacted a statute entitled 'An Act to establish an academic department in connection with Lincoln Institute *for the higher education of the negro race,*' which statute established in Lincoln Institute an academic department for such higher education, including a college and preparatory school for said college; and authorized the board of regents '*as the growing*

*necessities of this department may demand to introduce such studies as are pursued in the academic department of the State University,'* with power to employ necessary instructors (Laws 1887, p. 270). This statute was carried forward as Sections 8140 and 8141, R. S. 1889.

"In 1891 the General Assembly enacted a statute establishing an industrial school as a department of Lincoln Institute, 'in order that *the negro youths of this state* may receive instruction in those branches of study relating to agriculture and mechanic arts, and thereby fit themselves to engage in the useful trades.' This statute further provided for an equitable division of certain federal grants of money between the agricultural and mechanical college and School of Mines and Metallurgy' *established exclusively for the benefit of white students,'* and the agricultural and mechanical college at Lincoln Institute established '*for the exclusive benefit of colored students'* (Laws 1891, pp. 22-23, Secs. 1 and 6). This act greatly enlarged the scope of education provided for negroes at Lincoln Institute. The act demonstrates that the State of Missouri was aware of the growing need for negro education and was responding to the obligation to provide it. This act was carried forward through subsequent revisions to and including the Revision of 1919 (R. S. 1919, Secs. 11511 to 11521, inclusive).

"In 1921 the present Lincoln University Act was enacted (Laws 1921, page 86). The title of that act is most significant as indicating the legislative intent, and, therefore, the public policy of the State, in this matter. The title, in part, reads as follows:

" 'An act to repeal Article XVIIa, Revised Statutes of Missouri, 1919, . . . and to enact a new article in lieu thereof . . . the same to provide for the organization and scope of the Lincoln University, *for the higher education of the negro race.'*

"This same public policy is reiterated and emphasized in the body of the act, particularly in Section 3 thereof, where it says that 'the Board of Curators of the Lincoln University shall be authorized and required to reorganize said institution *so that it shall afford to the negro people of the state* opportunity for training up to the standard furnished at the State University' (Sec. 9618, R. S. 1929). This policy as to segregation of the races in higher education is still further clearly fixed by Section 7 of the Act providing that 'pending the full development of the Lincoln University' the board of curators shall have authority to arrange for the attendance of 'negro residents of the state' at the university of any adjacent state to take courses of study provided at the state university but which are not taught at Lincoln University and to pay the reasonable tuition fees for such attendance. [Sec. 9622, R. S. 1929.]"

All of the foregoing statutes show a clear intention on the part

of the Legislature to separate the white and negro races for the purpose of higher education. The provisions of the 1921 Lincoln University Act, if it stood alone, would leave no doubt on that subject. Sections 3 and 7 of that act (now Secs. 9618 and 9622, R. S. 1929) are couched in language too plain to be misunderstood.

The provisions of Section 9618 evidence a clear intention on the part of the Legislature to give to the negro and white people of the State equal opportunity for higher education, but in separate schools. Why provide by Section 9618 that Lincoln University, a negro school, should be reorganized so that it would afford the negro people of the State opportunity for training up to the standard furnished at the University of Missouri, if the negroes already had, or if the Legislature intended they should have the opportunity for training at the University of Missouri by becoming a student therein? The answer is obvious. It is clear that the Legislature intended to bring the Lincoln University up to the standard of the University of Missouri, and give to the whites and negroes an equal opportunity for higher education—the whites at the University of Missouri, and the negroes at Lincoln University.

The provisions of Section 9622 to the effect that negro residents of this State may attend the university of any adjacent state with their tuition paid, pending the full development of Lincoln University, makes it clear that the Legislature did not intend that negroes and whites should attend the same university in this State.

■ Appellant contends that Section 9657, Revised Statutes 1929, opens the doors of the University to negroes. This statute reads as follows:

"All youths, resident of the state of Missouri, over the age of sixteen years, shall be admitted to all the privileges and advantages of the various classes of all the departments of the university of the state of Missouri, without payment of tuition: . . . *and provided further*, that nothing herein enacted shall be construed to prevent the board of curators from collecting reasonable tuition fees in the professional departments, and the necessary fees for maintenance of the laboratories in all departments of the university, and establishing such other reasonable fees for library, hospital, incidental expenses or late registration as they may deem necessary. [R. S. 1919, sec. 11554.]"

Appellant seems to hang his contention on the words "all youths." The argument appears to be that when the Legislature provided that *all youths*, residents of the State of Missouri, over the age of sixteen years, should be admitted to the privileges and advantages offered by the University of Missouri without payment of tuition, it intended by the use of the words, *all youths*, to include negro as well as white youths. Such a construction of this statute, standing alone, would be at war with the provisions of the Act of 1870,

the Act of 1887, the Act of 1891 and finally the present Lincoln University Act of 1921, the provisions of which we have heretofore pointed out, as evidencing a clear and unmistakable intention on the part of the Legislature to separate the races for the purpose of higher education.

What is now Section 9657 was first enacted in 1872. The 1872 act provided that "*all youths*" resident of the State of Missouri between certain ages should be admitted to the privileges of the University of Missouri upon payment of a tuition fee of ten dollars, and such fees as the board of curators might establish, not to exceed five dollars per term. This section was amended through the years and now appears as Section 9657. It now provides that *all youths* residents of the State of Missouri, over the age of sixteen years, shall be admitted to all the privileges of the University of Missouri without payment of tuition, but authorizes the board of curators to exact the payment of fees in certain named departments.

This statute deals with the question of tuition and fees to be paid for higher education. It must, therefore, be read and construed in connection with all other statutes dealing with the subject of higher education. The Legislature could have had no purpose in adopting the 1887 Act, the 1891 Act and finally the 1921 Lincoln University Act, all providing for the development and reorganization of the Lincoln University, "so that it shall afford to the negro people of the State opportunity for training up to the standards furnished at the State University of Missouri," if, as appellant contends, the prior Act of 1872 gave them opportunity for higher education at the University of Missouri. The history of the Act of 1872 (now Sec. 9657) when read in connection with later enactments providing for higher education of the negro at Lincoln University forces the conclusion that the purpose of the Act of 1872 was to regulate tuition and fees to be exacted from those admitted to the University of Missouri, and not to define eligibility for admission. This construction of the 1872 Act is not only reasonable but it harmonizes with the statutes segregating the races for the purpose of higher education and effectuates the evident intention of the Legislature.

█ It is urged that the refusal to admit appellant as a student in the University of Missouri denies him the equal protection of the laws, in violation of the equal protection clause of the Fourteenth Amendment.

We have held that the statute establishing separate schools for colored children does not violate the Fourteenth Amendment. [Lehew v. Brummell, 103 Mo. 546, 551, 15 S. W. 765.] In that case Brummell, a negro, had four children of school age residing with him in School District No. 4 in Grundy County. No separate school was maintained in that district for the education of colored

children. There was such a separate school in the town of Trenton in the same county, which these colored children could have attended with transportation and tuition fees paid. The trial court perpetually enjoined these colored children from attending the school maintained for white children in District 4. On appeal we affirmed the judgment of the trial court. In so holding, we, among other things, said:

"But it will be said the classification now in question is one based on color, and so it is; but the color carries with it natural race peculiarities which furnish the reason for the classification. There are differences in races, and between individuals of the same race, not created by human laws, some of which can never be eradicated. These differences create different social relations recognized by all well-organized governments. If we cast aside chimerical theories and look to practical results, it seems to us it must be conceded that separate schools for colored children is a regulation to their great advantage."

In this same case we further said:

"The fact that the two races are separated for the purpose of receiving instruction deprives neither of any rights. It is but a reasonable regulation of the exercise of the right. As said in the case just cited, 'Equality and not identity of privileges and rights is what is guaranteed to the citizen.' Our conclusion is that the Constitution and laws of this State providing for separate schools for colored children are not forbidden by or in conflict with, the Fourteenth Amendment of the Federal Constitution; and the courts of last resort in several states have reached the same result."

In Plessy v. Ferguson, 163 U. S. 537, 544, that court spoke concerning race separation as follows:

"Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the State Legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of States where the political rights of the colored race have been longest and most earnestly enforced."

The right of a state to separate the races for the purpose of education is no longer an open question. Speaking to that question in Gong Lum et al. v. Rice et al., 275 U. S. 78, 85, 86, the Supreme Court of the United States said:

"The question here is whether a Chinese citizen of the United States is denied equal protection of the laws when he is classed among the colored races and furnished facilities for education equal

to that offered to all, whether white, brown, yellow or black. Were this a new question, it would call for very full argument and consideration, but we think that it is the same question which has been many times decided to be within the constitutional power of the State Legislature to settle without intervenion of the Federal Courts under the Federal Constitution." (Citing many cases.)

■ Contention is made that the judgment of the court below upholding respondents' refusal to admit appellant as a student in the University of Missouri is violative of Section 30 of Article II of the Constitution of Missouri in that it deprived him of his property without due process of law.

The argument is that since appellant is a citizen and taxpayer of Missouri, he has proprietary interest in the University of Missouri, and to refuse him admission as a student therein deprives him of such proprietary interest without due process of law in violation of Section 30 of Article II of the Constitution of Missouri. There is no question but what negro citizens and taxpayers of Missouri are entitled to school advantages substantially equal to those furnished white citizens of the State. However, equality and not identity of school advantages is what the law guarantees to every citizen, white or black. Since it is settled law that the mere separation of the races for the purpose of education deprives neither of any rights, the remaining question is whether or not the advantages for higher education offered to the negroes of the State are substantially equal to the advantages furnished white students. If they are, appellant is not deprived of his proprietary rights or any other right guaranteed to him by the State or Federal Constitution.

■ Appellant made no attempt to avail himself of the opportunities afforded the negro people of the State for higher education. He at no time applied to the management of the Lincoln University for legal training. Had he done so it would have been the duty of the board of curators to either provide a law school for him at Lincoln University as provided in Section 9618, or furnish him opportunity for legal training elsewhere, substantially equal to that furnished white students at the University of Missouri, as provided in Section 9622. The universities of the adjacent states of Kansas, Nebraska, Iowa and Illinois, admit nonresident negroes as students in their law department. The law department of these universities, as well as the law department of the University of Missouri are schools of high standing. They are each members of the Association of American Law Schools, and each are on the approved list of the American Bar Association. Evidence offered by appellant shows that one desiring to practice law in Missouri can get as sound, comprehensive, valuable legal education in the law schools of Kansas, Nebraska, Iowa and Illinois, as in the University of Missouri. Appellant's evidence further shows 'that' the system

of education used in the law schools of the four adjacent states is the same as that used in the University of Missouri Law School, and is designed to give the student a basis for the practice of law in any state where the Anglo-American system of law obtains; that the University of Missouri Law School does not specialize in Missouri law; that the course of study and case books used in the five schools are substantially identical; that students frequently transfer from one of these schools to the other, receive full credit for the work done in the former school, and pursue their course without loss of time. The record shows that out of 6966 cases in the case books used in the three-year course in the Missouri Law School, only 97 or 1.2 per cent of all such cases are from Missouri.

The distance appellant would be required to travel from his home to these universities as well as the cost of transportation follows:

|  | Mileage | Transportation |
|---|---|---|
| St. Louis to Columbia, Missouri | 146 | $2.95 |
| St. Louis to Champaign, Illinois | 174 | 3.48 |
| St. Louis to Iowa City, Iowa | 299 | 5.98 |
| St. Louis to Lawrence, Kansas | 319 | 6.38 |
| St. Louis to Lincoln, Nebraska | 468 | 9.35 |

The record shows that white residents in some parts of Missouri travel farther to reach the University of Missouri at Columbia, than appellant would have to travel from his home in St. Louis to the university in either of the four adjacent states. A resident of Caruthersville, Missouri, would have to travel 367 miles, while a resident of Jefferson City, Missouri, would travel only 31 miles to reach the University of Missouri, yet, the Caruthersville resident could not claim he was discriminated against or assert that he was entitled to have a university located within 31 miles of his residence so that he and the Jefferson City resident would have equal opportunity to obtain a university education. "The law does not undertake to establish a school within a given distance of anyone, white or black." The difference in distances to be traveled, if not unreasonable or discriminatory, is but an incident to any classification for school purposes and furnishes no substantial ground for complaint. [Lehew v. Brummell, 103 Mo. 546, 552, 15 S. W. 765; People ex rel. King v. Gallagher, 93 N. Y. 438, 451-2.]

If plantiff were permitted to attend Missouri University, he would necessarily pay living expenses away from his home, the same as if he attended the university in either of other four adjacent states. If he attended the Law Department of either of the foreign universities, the State of Missouri would pay his attendance fees, which for the first year, would range from $109.75 to $178. If he attended the Law Department of the University of Missouri, he would be required to pay his attendance fees, which for the first year would be $127.50.

The pertinent parts of the 1935 appropriation act read as follows: "There is hereby appropriated out of the State Treasury chargeable to the general revenue fund for the years 1935 and 1936, th· sum of Ten Thousand Dollars ($10,000,00) to be used in paying the tuition of negro college students to some standard college or university not located in Missouri; . . . provided that the total amount paid shall not exceed the difference between the registration and incidental fees charged by the University of Missouri to resident students and the school attended for similar courses."

At the time appellant applied for admission to the Missouri Law School in August, 1935, there was an unexpended balance of $6,351.18 in this scholarship fund. On April 17, 1936, the amount remaining in this fund was $2,214.98. It thus appears that there was ample funds on hand to pay appellant's tuition in the Law Department of the university in either of the four adjacent states for the years 1935 and 1936.

Appellant contends that Missouri would not pay his full tuition in an adjacent state, but only the difference between the tuition charged by the University of Missouri and that charged by the adjacent states, as provided in the appropriation act of 1935. The proviso in the 1935 act which attempts to limit the authority of the board of curators to the payment of the difference between the tuition in Missouri and in the adjacent states is unconstitutional and void. A general statute (Sec. 9622, R. S. 1929) authorizes the board of curators of Lincoln University to pay the reasonable tuition fees of negro residents of Missouri for attendance at the university of any adjacent state. This statute cannot be repealed or amended except by subsequent general legislation. Legislation of a general character cannot be included in an appropriation bill. To do so would violate Section 28 of Article IV of the Constitution which provides that no bill shall contain more than one subject which shall be clearly expressed in its title. There is no question but what the mere appropriation of money and the amendment of Section 9622, a general statute granting certain authority to the board of curators, are two different and separate subjects. [State ex rel. Davis v. Smith, 335 Mo. 1069, 75 S. W. (2d) 828; State ex rel. Hueller v. Thompson, 316 Mo. 272, 289 S. W. 338.] The valid and invalid portions of the statute are separable. If we disregard the invalid proviso there is left a complete workable statute which appropriates the sum of $10,000 for the purposes therein named. Had appellant applied for the benefits of this appropriation, it would have been the duty of the board of curators of Lincoln University to pay his full tuition in the Law Department of the university of an adjacent state. However, if the proviso in the appropriation act were valid, and Missouri paid only the difference between the fees charged by the University of Mis-

souri and the charges exacted by the adjacent state, that fact would not render the opportunity offered appellant for a law education in an adjacent state unequal to that offered by the University of Missouri, because if appellant attended the Missouri University he would be required to pay the full tuition charges himself, the same as white students are required to do.

For all of the reasons stated, we hold that the opportunity offered appellant for a law education in the university of an adjacent state is substantially equal to that offered to white students by the University of Missouri.

Appellant cites many cases in support of his contentions. Among the cases cited is Pearson v. Murray, 169 Md. 478, 488, 182 Atl. 590, 103 A. L. R. 706, upon which he places much reliance. The facts in that case are so radically different from the facts in the instant case that we do not regard that case as an authority in support of the contentions made in this case. It was held in the Pearson case that the negro was entitled to be admitted to the Law Department of the University of Maryland because the State of Maryland had made no provision for establishing a law school for negroes, and the provisions made for the legal education of negroes outside of the State were inadequate. In so holding that court said:

"But in Maryland no officers or body of officers are authorized to establish a separate law school, there is no legislative declaration of a purpose to establish one, and the courts could not make the decision for the State, and order its officers to establish one. Therefore, the erection of a separate school is not here an available alternative remedy."

In Missouri the situation is exactly opposite. Section 9618, Revised Statutes 1929, authorizes and requires the board of curators of Lincoln University "to reorganize said institution so that it shall afford to the negro people of the state opportunity for training up to the standard furnished at the state university of Missouri whenever necessary and practicable in their opinion." This statute makes it the mandatory duty of the board of curators to establish a law school in Lincoln University whenever necessary or practical. [Lincoln University v. Hackmann, 295 Mo. 118, 124, 243 S. W. 320.] The statute was enacted in 1921. Since its enactment no negro, not even appellant, has applied to Lincoln University for a law education. This fact demonstrates the wisdom of the Legislature in leaving it to the judgment of the board of curators to determine when it would be necessary or practicable to establish a law school for negroes at Lincoln University. Pending that time adequate provision is made for the legal education of negroes in the university of some adjacent state, as heretofore pointed out.

The State of Maryland not only did not provide for the estab-

lishment of a law school for negroes whenever necessary or practicable but it failed to make adequate provision for their legal education elsewhere. In 1935 the Legislature of Maryland made provision for fifty scholarships of $200 each to negroes, to enable them to attend colleges outside the State, mainly to give the benefit of college, medical, law, and other professional courses to the colored youth of the State for whom no such facilities were available in the State of Maryland. This law became effective June 1, 1935. On June 18, when the Pearson case was tried below, "three hundred and eighty negroes had sought blanks for applying for the scholarships, and one hundred and thirteen applications had been filled in and returned." From this situation, it is apparent that many of the negro applicants would not get a scholarship. Whether or not the negro in the Pearson case would get one was altogether problematical. The Maryland court held that such a provision for the professional education of negro students outside the State of Maryland was wholly inadequate. In so holding that court said:

"That any one of the many individual applicants would receive one of the 50 or more scholarships was obviously far from assured. For a large percentage of them there was no provision. . . .

"The Court is clear that this rather slender chance for any one applicant at an opportunity to attend an outside law school, at increased expense, falls short of providing for students of the colored race facilities substantially equal to those furnished to the whites in the law school maintained in Baltimore."

The court advanced other reasons why the opportunities afforded negroes for a legal education outside the State of Maryland was not equal to the opportunity furnished the whites in the law school maintained in Baltimore, but no such reasons are present in the instant case, as will be shown by a comparison of the record in the two cases.

As we read the Maryland case, it holds that the negro there involved was entitled to be admitted to the law school maintained for the whites in Baltimore for two reasons, (1) because the State had not authorized the establishment of a law school within the State for negroes, and there was no legislative declaration of purpose to do so, and (2) because the provision made for the legal education of negro students in schools outside the State was wholly inadequate and not substantially equal to the opportunity afforded the whites within the State.

The opposite situation obtains in Missouri. First, there is a legislative declaration of a purpose to establish a law school for negroes at Lincoln University whenever necessary or practical. Second, pending the establishment of such a school, adequate provision has been made for the legal education of negro students in recognized schools outside of this State. For these reasons the Maryland case

is not in point here. Many other cases are cited by appellant, but in our judgment, they have no bearing on this case in view of our constitutional and statutory provisions separating the races for the purpose of education, and as we have pointed out, making provisions for higher education of the negro substantially equal to the provisions made for the whites.

Other points are advanced by appellant but they are all included in the questions we have discussed and determined.

For all of the reasons stated the judgment below should be affirmed. It is so ordered. All concur.