MISSOURI ex rel. GAINES *v.* CANADA, REGIS-
TRAR OF THE UNIVERSITY OF MISSOURI,
ET AL.

No. 57.   Argued November 9, 1938.—Decided December 12, 1938.

*Messrs. Charles H. Houston* and *Sidney R. Redmond,* with whom *Mr. Leon A. Ransom* was on the brief, for petitioner.

Messrs. *William S. Hogsett* and *Fred L. Williams,* with whom *Mr. Fred L. English* was on the brief, for respondents.

342

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Petitioner Lloyd Gaines, a negro, was refused admission to the School of Law at the State University of Missouri. Asserting that this refusal constituted a denial by the State of the equal protection of the laws in violation of the Fourteenth Amendment of the Federal Constitution, petitioner brought this action for mandamus to compel the curators of the University to admit him. On final hearing, an alternative writ was quashed and a peremptory writ was denied by the Circuit Court. The Supreme Court of the State affirmed the judgment. 113 S. W. 2d 783. We granted certiorari, October 10, 1938.

Petitioner is a citizen of Missouri. In August, 1935, he was graduated with the degree of Bachelor of Arts at the Lincoln University, an institution maintained by the State of Missouri for the higher education of negroes. That University has no law school. Upon the filing of his application for admission to the law school of the University of Missouri, the registrar advised him to communicate with the president of Lincoln University and the latter directed petitioner's attention to § 9622 of the Revised Statutes of Missouri (1929), providing as follows:

"Sec. 9622. *May arrange for attendance at university of any adjacent state—Tuition fees.*—Pending the full development of the Lincoln university, the board of

curators shall have the authority to arrange for the attendance of negro residents of the state of Missouri at the university of any adjacent state to take any course or to study any subjects provided for at the state university of Missouri, and which are not taught at the Lincoln university and to pay the reasonable tuition fees for such attendance; *provided* that whenever the board of curators deem it advisable they shall have the power to open any necessary school or department. (Laws 1921, p. 86, § 7.)"

Petitioner was advised to apply to the State Superintendent of Schools for aid under that statute. It was admitted on the trial that petitioner's "work and credits at the Lincoln University would qualify him for admission to the School of Law of the University of Missouri if he were found otherwise eligible." He was refused admission upon the ground that it was "contrary to the constitution, laws and public policy of the State to admit a negro as a student in the University of Missouri." It appears that there are schools of law in connection with the state universities of four adjacent States, Kansas, Nebraska, Iowa and Illinois, where nonresident negroes are admitted.

The clear and definite conclusions of the state court in construing the pertinent state legislation narrow the issue. The action of the curators, who are representatives of the State in the management of the state university (R. S. Mo., § 9625), must be regarded as state action.[1] The state constitution provides that separate free public schools shall be established for the education of children of African descent (Art. XI, § 3), and by statute separate high school facilities are supplied for colored students equal to those provided for white students (R. S. Mo.,

[1] *Ex parte Virginia,* 100 U. S. 339, 346, 347; *Neal* v. *Delaware,* 103 U. S. 370, 397; *Carter* v. *Texas,* 177 U. S. 442, 447; *Norris* v. *Alabama,* 294 U. S. 587, 589.

344

§§ 9346–9349). While there is no express constitutional provision requiring that the white and negro races be separated for the purpose of higher education, the state court on a comprehensive review of the state statutes held that it was intended to separate the white and negro races for that purpose also. Referring in particular to Lincoln University, the court deemed it to be clear "that the Legislature intended to bring the Lincoln University up to the standard of the University of Missouri, and give to the whites and negroes an equal opportunity for higher education—the whites at the University of Missouri, and the negroes at Lincoln University." Further, the court concluded that the provisions of § 9622 (above quoted) to the effect that negro residents "may attend the university of any adjacent State with their tuition paid, pending the full development of Lincoln University," made it evident "that the Legislature did not intend that negroes and whites should attend the same university in this State." In that view it necessarily followed that the curators of the University of Missouri acted in accordance with the policy of the State in denying petitioner admission to its School of Law upon the sole ground of his race.

In answering petitioner's contention that this discrimination constituted a denial of his constitutional right, the state court has fully recognized the obligation of the State to provide negroes with advantages for higher education substantially equal to the advantages afforded to white students. The State has sought to fulfill that obligation by furnishing equal facilities in separate schools, a method the validity of which has been sustained by our decisions. *Plessy* v. *Ferguson,* 163 U. S. 537, 544; *McCabe* v. *Atchison, T. & S. F. Ry. Co.,* 235 U. S. 151, 160; *Gong Lum* v. *Rice,* 275 U. S. 78, 85, 86. Compare *Cumming* v. *Board of Education,* 175 U. S. 528, 544, 545. Respondents' counsel have appropriately emphasized the special

solicitude of the State for the higher education of negroes as shown in the establishment of Lincoln University, a state institution well conducted on a plane with the University of Missouri so far as the offered courses are concerned. It is said that Missouri is a pioneer in that field and is the only State in the Union which has established a separate university for negroes on the same basis as the state university for white students. But, commendable as is that action, the fact remains that instruction in law for negroes is not now afforded by the State, either at Lincoln University or elsewhere within the State, and that the State excludes negroes from the advantages of the law school it has established at the University of Missouri.

It is manifest that this discrimination, if not relieved by the provisions we shall presently discuss, would constitute a denial of equal protection. That was the conclusion of the Court of Appeals of Maryland in circumstances substantially similar in that aspect. *University of Maryland* v. *Murray*, 169 Md. 478; 182 A. 590. It there appeared that the State of Maryland had "undertaken the function of education in the law" but had "omitted students of one race from the only adequate provision made for it, and omitted them solely because of their color"; that if those students were to be offered "equal treatment in the performance of the function, they must, at present, be admitted to the one school provided." *Id.*, p. 489. A provision for scholarships to enable negroes to attend colleges outside the State, mainly for the purpose of professional studies, was found to be inadequate (*Id.*, pp. 485, 486) and the question, "whether with aid in any amount it is sufficient to send the negroes outside the State for legal education," the Court of Appeals found it unnecessary to discuss. Accordingly, a writ of mandamus to admit the applicant was issued to the officers and

regents of the University of Maryland as the agents of the State entrusted with the conduct of that institution.

The Supreme Court of Missouri in the instant case has distinguished the decision in Maryland upon the grounds—(1) that in Missouri, but not in Maryland, there is "a legislative declaration of a purpose to establish a law school for negroes at Lincoln University whenever necessary or practical"; and (2) that, "pending the establishment of such a school, adequate provision has been made for the legal education of negro students in recognized schools outside of this State." 113 S. W. 2d, p. 791.

As to the first ground, it appears that the policy of establishing a law school at Lincoln University has not yet ripened into an actual establishment, and it cannot be said that a mere declaration of purpose, still unfulfilled, is enough. The provision for legal education at Lincoln is at present entirely lacking. Respondents' counsel urge that if, on the date when petitioner applied for admission to the University of Missouri, he had instead applied to the curators of Lincoln University it would have been their duty to establish a law school; that this "agency of the State," to which he should have applied, was "specifically charged with the mandatory duty to furnish him what he seeks." We do not read the opinion of the Supreme Court as construing the state statute to impose such a "mandatory duty" as the argument seems to assert. The state court quoted the language of § 9618, R. S. Mo. 1929, set forth in the margin,[2] making it the mandatory

---

[2] Section 9618, R. S. Mo. 1929, is as follows:

"Sec. 9618. *Board of curators authorized to reorganize.*—The board of curators of the Lincoln university shall be authorized and required to reorganize said institution so that it shall afford to the negro people of the state opportunity for training up to the standard furnished at the state university of Missouri whenever necessary and practicable in their opinion. To this end the board of curators shall be authorized

duty of the board of curators to establish a law school in Lincoln University "whenever necessary and practicable in their opinion." This qualification of their duty, explicitly stated in the statute, manifestly leaves it to the judgment of the curators to decide when it will be necessary and practicable to establish a law school, and the state court so construed the statute. Emphasizing the discretion of the curators, the court said:

"The statute was enacted in 1921. Since its enactment no negro, not even appellant, has applied to Lincoln University for a law education. This fact demonstrates the wisdom of the legislature in leaving it to the judgment of the board of curators to determine when it would be necessary or practicable to establish a law school for negroes at Lincoln University. Pending that time adequate provision is made for the legal education of negroes in the university of some adjacent State, as heretofore pointed out." 113 S. W. 2d p. 791.

The state court has not held that it would have been the duty of the curators to establish a law school at Lincoln University for the petitioner on his application. Their duty, as the court defined it, would have been either to supply a law school at Lincoln University as provided in § 9618 or to furnish him the opportunity to obtain his legal training in another State as provided in § 9622. Thus the law left the curators free to adopt the latter course. The state court has not ruled or intimated that their failure or refusal to establish a law school for a very few students, still less for one student, would have been an abuse of the discretion with which the curators were entrusted. And, apparently, it was because of that discre-

---

to purchase necessary additional land, erect necessary additional buildings, to provide necessary additional equipment, and to locate, in the county of Cole the respective units of the university where, in their opinion, the various schools will most effectively promote the purposes of this article. (Laws of 1921, p. 86, § 3.)"

tion, and of the postponement which its exercise in accordance with the terms of the statute would entail until necessity and practicability appeared, that the state court considered and upheld as adequate the provision for the legal education of negroes, who were citizens of Missouri, in the universities of adjacent States. We may put on one side respondent's contention that there were funds available at Lincoln University for the creation of a law department and the suggestions with respect to the number of instructors who would be needed for that purpose and the cost of supplying them. The president of Lincoln University did not advert to the existence or prospective use of funds for that purpose when he advised petitioner to apply to the State Superintendent of Schools for aid under § 9622. At best, the evidence to which argument as to available funds is addressed admits of conflicting inferences, and the decision of the state court did not hinge on any such matter. In the light of its ruling we must regard the question whether the provision for the legal education in other States of negroes resident in Missouri is sufficient to satisfy the constitutional requirement of equal protection, as the pivot upon which this case turns.

The state court stresses the advantages that are afforded by the law schools of the adjacent States,—Kansas, Nebraska, Iowa and Illinois,—which admit non-resident negroes. The court considered that these were schools of high standing where one desiring to practice law in Missouri can get "as sound, comprehensive, valuable legal education" as in the University of Missouri; that the system of education in the former is the same as that in the latter and is designed to give the students a basis for the practice of law in any State where the Anglo-American system of law obtains; that the law school of the University of Missouri does not specialize in Missouri law and that the course of study and the case books used

in the five schools are substantially identical. Petitioner insists that for one intending to practice in Missouri there are special advantages in attending a law school there, both in relation to the opportunities for the particular study of Missouri law and for the observation of the local courts,[3] and also in view of the prestige of the Missouri law school among the citizens of the State, his prospective clients. Proceeding with its examination of relative advantages, the state court found that the difference in distances to be traveled afforded no substantial ground of complaint and that there was an adequate appropriation to meet the full tuition fees which petitioner would have to pay.

We think that these matters are beside the point. The basic consideration is not as to what sort of opportunities other States provide, or whether they are as good as those in Missouri, but as to what opportunities Missouri itself furnishes to white students and denies to negroes solely upon the ground of color. The admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the equality of the privileges which the laws give to the separated groups within the State. The question here is not of a duty of the State to supply legal training, or of the quality of the training which it does supply, but of its duty when it provides such training to furnish it to the residents of the State upon the basis of an equality of right. By the operation of the laws of Missouri a privilege has been created for white law students which is denied to negroes by reason of their race. The white resident is afforded legal education within the State; the negro resident having the same qualifications is refused it there and must go outside the State to obtain it. That is a denial of the equality of legal right to the enjoyment of the privilege

---

[3] See *University of Maryland* v. *Murray*, 169 Md. 478, 486.

which the State has set up, and the provision for the payment of tuition fees in another State does not remove the discrimination.

The equal protection of the laws is "a pledge of the protection of equal laws." *Yick Wo* v. *Hopkins*, 118 U. S. 356, 369. Manifestly, the obligation of the State to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction. It is there that the equality of legal right must be maintained. That obligation is imposed by the Constitution upon the States severally as governmental entities,—each responsible for its own laws establishing the rights and duties of persons within its borders. It is an obligation the burden of which cannot be cast by one State upon another, and no State can be excused from performance by what another State may do or fail to do. That separate responsibility of each State within its own sphere is of the essence of statehood maintained under our dual system. It seems to be implicit in respondents' argument that if other States did not provide courses for legal education, it would nevertheless be the constitutional duty of Missouri when it supplied such courses for white students to make equivalent provision for negroes. But that plain duty would exist because it rested upon the State independently of the action of other States. We find it impossible to conclude that what otherwise would be an unconstitutional discrimination, with respect to the legal right to the enjoyment of opportunities within the State, can be justified by requiring resort to opportunities elsewhere. That resort may mitigate the inconvenience of the discrimination but cannot serve to validate it.

Nor can we regard the fact that there is but a limited demand in Missouri for the legal education of negroes as excusing the discrimination in favor of whites. We had occasion to consider a cognate question in the case

of *McCabe* v. *Atchison, T. & S. F. Ry. Co., supra.* There the argument was advanced, in relation to the provision by a carrier of sleeping cars, dining and chair cars, that the limited demand by negroes justified the State in permitting the furnishing of such accommodations exclusively for white persons. We found that argument to be without merit. It made, we said, the constitutional right "depend upon the number of persons who may be discriminated against, whereas the essence of the constitutional right is that it is a personal one. Whether or not particular facilities shall be provided may doubtless be conditioned upon there being a reasonable demand therefor, but, if facilities are provided, substantial equality of treatment of persons traveling under like conditions cannot be refused. It is the individual who is entitled to the equal protection of the laws, and if he is denied by a common carrier, acting in the matter under the authority of a state law, a facility or convenience in the course of his journey which under substantially the same circumstances is furnished to another traveler, he may properly complain that his constitutional privilege has been invaded." *Id.,* pp. 161, 162.

Here, petitioner's right was a personal one. It was as an individual that he was entitled to the equal protection of the laws, and the State was bound to furnish him within its borders facilities for legal education substantially equal to those which the State there afforded for persons of the white race, whether or not other negroes sought the same opportunity.

It is urged, however, that the provision for tuition outside the State is a temporary one,—that it is intended to operate merely pending the establishment of a law department for negroes at Lincoln University. While in that sense the discrimination may be termed temporary, it may nevertheless continue for an indefinite period by reason of the discretion given to the curators of Lincoln

University and the alternative of arranging for tuition in other States, as permitted by the state law as construed by the state court, so long as the curators find it unnecessary and impracticable to provide facilities for the legal instruction of negroes within the State. In that view, we cannot regard the discrimination as excused by what is called its temporary character.

We do not find that the decision of the state court turns on any procedural question. The action was for mandamus, but it does not appear that the remedy would have been deemed inappropriate if the asserted federal right had been sustained. In that situation the remedy by mandamus was found to be a proper one in *University of Maryland* v. *Murray, supra.* In the instant case, the state court did note that petitioner had not applied to the management of Lincoln University for legal training. But, as we have said, the state court did not rule that it would have been the duty of the curators to grant such an application, but on the contrary took the view, as we understand it, that the curators were entitled under the state law to refuse such an application and in its stead to provide for petitioner's tuition in an adjacent State. That conclusion presented the federal question as to the constitutional adequacy of such a provision while equal opportunity for legal training within the State was not furnished, and this federal question the state court entertained and passed upon. We must conclude that in so doing the court denied the federal right which petitioner set up and the question as to the correctness of that decision is before us. We are of the opinion that the ruling was error, and that petitioner was entitled to be admitted to the law school of the State University in the absence of other and proper provision for his legal training within the State.

The judgment of the Supreme Court of Missouri is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

Separate opinion of MR. JUSTICE McREYNOLDS.

Considering the disclosures of the record, the Supreme Court of Missouri arrived at a tenable conclusion and its judgment should be affirmed. That court well understood the grave difficulties of the situation and rightly refused to upset the settled legislative policy of the State by directing a mandamus.

In *Cumming* v. *Richmond County Board of Education,* 175 U. S. 528, 545, this Court through Mr. Justice Harlan declared—"The education of the people in schools maintained by state taxation is a matter belonging to the respective States, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land." *Gong Lum* v. *Rice,* 275 U. S. 78, 85—opinion by Mr. Chief Justice Taft—asserts: "The right and power of the state to regulate the method of providing for the education of its youth at public expense is clear."

For a long time Missouri has acted upon the view that the best interest of her people demands separation of whites and negroes in schools. Under the opinion just announced, I presume she may abandon her law school and thereby disadvantage her white citizens without improving petitioner's opportunities for legal instruction; or she may break down the settled practice concerning separate schools and thereby, as indicated by experience, damnify both races. Whether by some other course it may be possible for her to avoid condemnation is matter for conjecture.

The State has offered to provide the negro petitioner opportunity for study of the law—if perchance that is the thing really desired—by paying his tuition at some nearby school of good standing. This is far from unmistakable disregard of his rights and in the circum-

stances is enough to satisfy any reasonable demand for specialized training. It appears that never before has a negro applied for admission to the Law School and none has ever asked that Lincoln University provide legal instruction.

The problem presented obviously is a difficult and highly practical one. A fair effort to solve it has been made by offering adequate opportunity for study when sought in good faith. The State should not be unduly hampered through theorization inadequately restrained by experience.

This proceeding commenced in April, 1936. Petitioner then twenty-four years old asked mandamus to compel his admission to the University in September, 1936, notwithstanding plain legislative inhibition. Mandamus is not a writ of right but is granted only in the court's discretion upon consideration of all the circumstances. *Duncan Townsite Co.* v. *Lane,* 245 U. S. 308, 311; *United States ex rel. Arant* v. *Lane,* 249 U. S. 367, 371.

The Supreme Court of Missouri did not consider the propriety of granting the writ under the theory of the law now accepted here. That, of course, will be matter open for its consideration upon return of the cause.

MR. JUSTICE BUTLER concurs in the above views.