STATE OF MISSOURI at the Relation of MARJORIE VANDERBILT TOLIVER, a minor, by CARRIE TERRY DEMPSEY, her Next Friend, Respondent, v. BOARD OF EDUCATION OF THE CITY OF ST. LOUIS, a Corporation, PHILIP J. HICKEY, CHARLES A. NAYLOR, JR., and HUGH H. BARR, Appellants, No. 41543—230 S. W. (2d) 724.

Division Two, May 8, 1950.

Rehearing Denied, June 13, 1950.

672

*Emmet T. Carter* and *Gerald K. Presberg* for appellants.

*Robert L. Witherspoon, Henry D. Espy* and *S. R. Redmond* for respondent.

BOHLING, C.—The City of St. Louis maintains two institutions for the primary purpose of training teachers for the elementary school system of said City, to wit: Harris Teachers College for white students and Stowe Teachers College for Negro students. Marjorie V. Toliver sought to transfer from Stowe to Harris Teachers College and upon her application to Harris Teachers College not being honored instituted this proceeding in mandamus to compel the Board of Education of said City and other interested officials to permit her to matriculate at Harris Teachers College. The trial resulted in favor of petitioner and a peremptory writ of mandamus was ordered directing the officials "to admit petitioner forthwith to Harris Teachers College." This appeal followed.

A motion to dismiss the appeal asserts appellants' brief does not contain a fair statement of the facts and that the ▇▇ points relied upon do not specify the allegations of error. See Rule 1.08 (a), (2, 3). The "Points and Authorities" are somewhat abstract

in nature; but reading them discloses the issue is whether the evidence sustains the relief granted petitioner. Forty-odd pages are devoted to a statement of the facts. We have studied the 800 pages of the instant record. Appellants' statement of the facts covers the matters relied upon in petitioner's brief. It is sufficient. Cruce v. Gulf, M. & O. Rd. Co., 358 Mo. 589, 216 S. W. 2d 78, 82[12]. We shall endeavor to keep this opinion within reasonable bounds.

Petitioner directs our attention to our duty to review the law and the evidence under Laws 1943, p. 387, § 114(d); Mo. R. S. A., § 847.114(d), giving due regard to the trial court's opportunity to judge the credibility of the witnesses and sustaining the judgment unless clearly erroneous. Ultimately, we have the responsibility to review the evidence, to form our own conclusions on the law and the evidence, and to decide the case as justice requires. Baerveldt & Honig Const. Co. v. Dye Candy Co., 357 Mo. 1072, 212 S. W. 2d 65[1]; Dye v. School Dist. No. 32, 355 Mo. 231, 195 S. W. 2d 874, 878[4]; Consolidated School Dist. v. Hooks (Mo. App.), 222 S. W. 2d 355, 359.

The Missouri Constitution provides: "'Separate schools shall be provided for white and colored children, except in cases otherwise provided by law." Mo. Const. 1945, Art. IX, § 1(a).

So, too: "Separate free schools shall be established for the education of children of African descent; and it shall hereinafter be unlawful for any colored child to attend any white school, or for any white child to attend a colored school." § 10,349, R. S. 1939, Mo. R. S. A.

Equal advantages and privileges are to be accorded white and colored children of school age within the boundaries of a given school district. Laws 1945, p. 1700, § 10,350, Mo. R. S. A. Consult Ch. 72, Art. X, R. S. 1939, Mo. R. S. A.

Enactments providing for the segregation of races have been held valid and not to violate provisions of the Constitution of the United States where substantially equal privileges are furnished the separated groups. See Missouri ex rel. Gaines v. Canada, 305 U. S. 337, 83 L. Ed. 208, 59 S. Ct. 232 (reversing 342 Mo. 121, 113 S. W. 2d 783); Sipuel v. University of Oklahoma, 332 U. S. 631, 92 L. Ed. 247, 68 S. Ct. 299; Gong Lum v. Rice, 275 U. S. 78, 72 L. Ed. 172, 48 S. Ct. 91.

In Missouri ex rel. Gaines v. Canada, supra, the United States Supreme Court considered that there existed no mandatory duty for the establishment of a law school for Negroes in Missouri (305 U. S. l. c. 347); that provisions for the education of Missouri Negro residents in other states did not meet the Federal Constitutional requirement of equal protection (Id. l. c. 348); that it was as an individual that petitioner was entitled to the equal protection of the laws (Id. l. c. 351), and held, in the circumstances, that Gaines

"was entitled to be admitted to the law school of the State. University in the absence of other and proper provision for his legal training within the State" (Id. l. c. 352), sustaining segregation where substantially equal advantages are offered each race (Id. l. c. s 344, 349). Upon remand, this court directed the trial court to deny the writ if facilities substantially equal to those existing at the Missouri University be available for Negroes at the next school term; otherwise the writ should issue. (344 Mo. 1238, 131 S. W. 2d 217.) See also Fisher v. Hurst, 333 U. S. 147, 92 L. Ed. 604, 68 S. Ct. 389, sustaining the action of the Oklahoma Court upon the reversal and remand of Sipuel v. University of Oklahoma, 199 Okl. 36, 180 P. 2d 135, and consult, 199 Okl. 586, 190 P. 2d 437.

The constitutional requirements are fulfilled if substantial equality, not necessarily identity, of privileges be afforded the citizens, white or colored, where segregation of the races is provided for. State ex rel. Gaines v. Canada, 305 U. S. 337, 344, 83 L. Ed. 208, 59 S. Ct. 232, and cases there cited; 342 Mo. 121, 113 S. W. 2d 783, 788[11]; Lehew v. Brummell, 103 Mo. 546, 552, 15 S. W. 765, 766; Fisher v. Hurst, supra; Butler v. Wilemon, 86 F. Supp. 397, 399; Reynolds v. Board of Education, 66 Kan. 672, 72 P. 274; Board of Education v. Ballard, 299 Ky. 370, 185 S. W. 2d 538.

Petitioner explicitly does not question the validity of the laws requiring segregation. She contends substantial equality is lacking in the accreditation of the two teacher colleges, in their faculties, in their libraries, and in their laboratories.

Petitioner was twenty years old and had finished two semesters at Stowe Teachers College (hereinafter designated Stowe). She applied for a transfer to Harris Teachers College (hereinafter designated Harris) for the stated reason "because Stowe is not accredited by North Central Association of Secondary Schools and Colleges," which she felt would hamper her progress in the teaching field. She was informed that students were not permitted to transfer from Stowe to Harris, nor from Harris to Stowe, and it was suggested that she discuss the matter with Dr. Ruth Harris, President of Stowe. At the time of trial, January, 1949, petitioner repeated the above reason for desiring to transfer to Harris. She testified that an instructor had changed an assignment because a certain book was not in the library; that several instructors had permitted students to use their personal books because the books were not in the library in sufficient quantity; that on three occasions she did not receive the book she requested at the library, stating on one occasion the library copy was out. She stated Stowe students experienced difficulty entering Tuskegee Institute and St. Louis University, but could name no graduate of Stowe who had been refused admission to any school admitting Negroes to do graduate work. Other evidence established that graduates of Stowe entered

Washington University and St. Louis University. Additional testimony by petitioner is covered in greater detail by other witnesses.

Dr. Ruth Harris, President of Stowe, testified that petitioner did not request any course which was not offered at Stowe; that petitioner was, at the time of the trial, taking the courses she requested and wanted; that petitioner made no complaint to her concerning the faculty, the administration, or any shortcomings of Stowe, and that the first she knew of the situation was when petitioner instituted this suit.

The evidence established that the American Association of Teachers Colleges was a standard accrediting agency of national scope for teacher colleges. Both Harris and Stowe stood accredited by that agency. In addition, at the time of trial Harris stood accredited by the North Central Association of Colleges and Secondary Schools. Petitioner's principal complaint, viz.: Stowe was not thus accredited, ceased to have substance upon Stowe's application for accreditation being approved and Stowe being accredited by said North Central Association prior to the submission of the cause.

A large increase in the enrollment at Harris and at Stowe resulted upon the return of the veterans of World War II. This increase is considered of a temporary and not of a permanent nature. For the school year 1948-1949 Harris had approximately 1188 students and Stowe had approximately 650 students.

Harris had a total of 63 teachers, of which five were substitutes. Twenty, or about 30%, had Ph. D. degrees, one for each 59 pupils. Thirty-four, or about 52%, had M. A. degrees, one for each 35 pupils. Stowe had 41 teachers, of which thirteen were substitutes. At the time of trial Stowe had 8 teachers, or about 19%, with Ph. D. degrees (increased from four at the beginning of the year), one for every 74 pupils. Twenty-eight, or 60%, had M. A. degrees, one for every 24 pupils. On the basis of the normal teaching load of 15 hours a week and adjusting part time teachers thereto, there were 17 pupils for each teacher at Stowe and 22 pupils for each teacher at Harris. One teacher at Harris and ten teachers at Stowe were teaching outside their major or minor field. There was a scarcity of applicants, including applicants with a Ph. D. degree, for teachers at Stowe according to President Harris. There was evidence that four teachers at Stowe and two at Harris having Ph. D. degrees had resigned within the past three or four years. The preparation of teachers for elementary schools does not require instructors with Ph. D. degrees.

The increased enrollment resulted in a large number of substitute teachers at Harris and Stowe. A decreased enrollment at the white high schools created a surplus of white high school teachers. These included tenure teachers, some with 15 to 16 years' experience and entitled to $4,000 or more annual salary. After consideration they were transferred within a short time to Harris to replace the sub-

stitutes, and they will return to the high schools when needed. Salaries may not be reduced upon transfer. There was no surplus of Negro high school teachers. After conferences and in cooperation with those in charge at Stowe, the experienced substitute teachers were continued on at Stowe. The recommendations of President Harris with respect to the appointment of new teachers and the promotion of existing teachers are followed in building up the faculty at Stowe with the best qualified teachers.

The average teaching experience in teacher colleges for Harris teachers was 8 years against 7.6 years for Stowe teachers and the gross average total years service for Harris teachers was 26-1/3 years against 15-1/7 years for Stowe. The average age of the teachers at Harris was 48, and at Stowe it was 41.

The Board of Education has regulations and a schedule governing the employment of and the salaries for teachers in the system, increases in salary being based primarily on the length of service in the system. It applies to all teachers alike, white or colored. The starting salary is $2,400 and the maximum is $5,500 for regular teachers at Harris and at Stowe. Substitute teachers are paid on the basis of $10 a day. All regular teachers at Harris were receiving $3,000 or more. Ten regular teachers at Stowe were receiving less, but their salaries between the $2,400 minimum and $3,000 is not fully developed. The average annual regular teacher's salary at Harris was $4,454 and at Stowe $3,401. Mr. Miller, the Assistant Superintendent of Schools, refused to deny or affirm that Negroes who wanted "big salaries" were not employed as teachers; but did testify that Negroes with experience had been brought into the system "at a big salary." The President of Stowe receives the maximum of $6,500 as principal, whereas we understand the President of Harris, with a larger enrollment, receives less.

Harris is the older institution and its teachers should have a greater average age and teaching experience and, with the salary schedule based upon years of service in the system, they should be on a larger average salary. The temporary transfer to Harris of high school teachers with many years' experience and earnings of $4,000 or more also tends to increase the average experience and average salary for Harris teachers over Stowe, as well as the average age of Harris teachers. The influence of experience upon ability tends to level off as the years pass, and experience in teacher college work is approximately the same for Harris and Stowe. The evidence established that those in authority endeavored to reach a fair agreement with applicants respecting their salaries and does not establish arbitrary action or variances not warranted by differences in qualifications. The Superintendent of Instruction did not recall any Negro Ph. D. applicant who could have been employed under the existing salary schedule who was not employed. The Board of Education

changed its salary schedule in the Fall of 1948 to increase the pay for teachers at Harris and at Stowe; and there was evidence that the Board was offering higher salaries to secure teachers at Stowe than in any other division of the system. The pupil load per teacher at Stowe is less than at Harris.

The preponderance of the opinion evidence was to the effect that the faculties at Harris and at Stowe were comparable and equal; that about 95% of the teachers in the elementary schools of the City were graduates of Harris and Stowe; and that they were equal in scholastic ability and, aside from individual personalities, there was no difference in the quality of their teaching.

Complaint is made of the fact that the library at Harris had approximately 24,000 volumes while the library at Stowe had approximately 14,000 volumes. Donald Mackenzie was Dean of Blackburn College, had worked for the North Central Association of Colleges and Secondary Schools, and acts as Examiner for said Association from time to time. He was one of petitioner's witnesses and testified that "the number of volumes would not be an index of the quality of the library"; that the North Central Association no longer takes the number of volumes into consideration but is concerned with the kind of books in the library. Other expert witnesses on the subject testified to like effect. The evidence was that the teachers are expected to ascertain what books are available for use in their courses and request such additional books as are essential to properly teach their subjects. Dr. Harris testified that several requests for books at Stowe had not been honored; that, while well situated in some respects, Stowe did not have all the books desired in the library in every particular, but that they had sufficient books for the courses offered. · Arrangements exist with the City Public Library whereby books needed for temporary purposes are made available to all public schools. The Librarian for Stowe testified that the Stowe library had books on 275 of the 752 titles on the list of the North Central Association of Colleges and Secondary Schools; whereas the evidence was that Harris had books on 209 of said 752 titles. There was evidence that Harris had been functioning many years more than Stowe and thus had accumulated many books, and that the recency of the copyright is a factor for consideration; that in some instances the one and in other instances the other library appeared to be somewhat better situated upon giving consideration to individual titles and the books thereon published within the past ten years; and that arrangements were being made to provide additional shelving space needed at Stowe. The Supervisor of Libraries for the Board of Education and other witnesses testified that the library at Harris and the library at Stowe are comparable and adequate for the purposes for which they are intended.

A few general observations are apropos. Harris moved into new quarters in the Fall of 1948. The buildings were constructed about 1905 and were acquired about 1917 by the Board of. Education. They were first used as a high school, and then a junior college, and were described as "definitely a makeshift" from a planning standpoint for a teachers college.

Stowe was planned, constructed, and has been occupied as a teachers college since completion in 1940. It is far superior to Harris from a functional standpoint as a teachers college.

Stowe is located in a Negro community center, having elementary and high schools, hospitals, recreational and playground facilities with the buildings forming a perimeter of the area. Harris is in a residential section and not as well located for its purposes as Stowe.

Stowe offers 82 and Harris offers 100 courses. The differences are due to the desires of the different faculties. Neither college had a request for a course not offered.

Stowe has classes between .7 :45 a. m. and 5 :50 p. m., and. Harris, at the building, between 8 :15 a. m. and 4 :23 p. m. This is occasioned by about 160 Stowe students attending some class outside the regular school hours for the younger pupils at Sumner High School, Simmons Elementary School, and Tandy Community Center, all within a short distance of Stowe. The Stowe building was not constructed to accommodate 650 students, the increased enrollment. Students attending classes in different buildings is not unusual for colleges. Harris students attended classes in other buildings until the Fall of 1948. A few Harris courses are still offered at different locations and, we understand, a few classes continue after 4 :23 p. m.

The per pupil expense for the 1947-1948 school year was approximately $215 for each institution.

Harris, with the larger enrollment, has eight and Stowe has three laboratories. The Stowe laboratories are dsecribed as being modern and superior to those at Harris. On this issue, petitioner's brief states: "Stowe needs and has requested a cinema, an autoclave, an electrified furnace, lockers and slides in the laboratories. They are absolutely necessary. Harris has them. Stowe can't offer a major in biology."

James A. Turner, petitioner's witness, testified that he had taught science at Stowe for 19 years; and. that, without going into detail, in general "we have adequate equipment." With respect to heavy equipment, he testified that an autoclave (pressure cooker), an electrified furnace, and a second motion picture machine were needed; that an autoclave, an electrified furnace, and he thought, but did not know, two or more motion picture machines were available at Harris. He stated lockers are needed at Stowe, and considered such existing facilities inadequate. We understand the need for some of the additional equipment, such as microscopic slides and the motion

picture machine arose about three weeks prior to his testifying, when at the beginning of a semester Stowe started a new course theretofore cataloged but for which there had been no prior demand. . He testified that the courses offered by Stowe in biology et cetera were "rather thorough," but that they were not in a position to offer a major in biology. From his testimony we understand he had orders outstanding for certain equipment which he anticipated he would receive, and that as he proceeded with the subjects taught and determined what additional equipment was needed, he would place orders accordingly and anticipated receiving the equipment.

The policy of Missouri is to segregate the races for educational purposes and the mandatory duty is placed upon the authorities to furnish substantially equal facilities to the separate groups. It is the duty of the courts to maintain this policy of the State in harmony with the provisions of the Federal Constitution. State ex rel. Bluford v. Canada, 348 Mo. 298, 153 S. W. 2d 12, 17[6, 7]. We conclude that under the record there exists substantially equal privileges to the segregated groups with respect to the accreditation, to the faculties, to the libraries, and to the laboratories at Harris and Stowe.. It is not required that the facilities be identical. Some of the differences are of a temporary nature and likely will disappear upon the enrollment returning to normal. The two colleges should be maintained on a parity. The differences appearing in the instant record do not establish a substantial inequality in the privileges offered. In a number of important instances Stowe appears to be better situated than Harris.

The record does not disclose that petitioner stands deprived of any individual constitutional right. Missouri ex rel. Gaines v. Canada, 305 U. S. 1. c. 351. In the instant case the constituted authorities are endeavoring to discharge their mandatory duty of providing substantially equal facilities to the segregated groups within their territorial jurisdiction; and the case is readily distinguishable from the Gaines case, supra, and Corbin v. County School Board, 177 F. 2d 924, 928, stressed by petitioner. There were many and glaring inequalities affecting the plaintiffs in the Corbin case. The instant record differs materially. Petitioner is receiving the courses at Stowe she has requested. She did not complain to the Stowe authorities respecting any deficiency at Stowe and seek its correction within the declared policy of the State. The main differences of record appear to exist in some of the laboratories facilities, differences considered not to constitute substantial inequality. There is no affirmative showing that petitioner is adversely affected by these differences. Generally, before one may inject a constitutional issue his constitutional rights must be directly affected. State ex rel. Crandall v. McIntosh, 205 Mo. 589, 605, 103 S. W. 1078, 1082, states, after discussion: "The sum of the matter is, not that his neighbor is hurt,

but that a litigant himself must be hurt by the unconstitutional exercise of power before he may vex the judicial ear with complaints.'' See State v. Armour Pharmacy (Mo.), 152 S. W. 2d 67, 68[1], and cases cited. It also has been considered that one may not anticipate an unlawful refusal on the part of constituted authorities to discharge a mandatory duty. ██ Bluford v. Canada, 32 F. Supp. 707, 711, citing Highlands Farm Dairy v. Agnew, 300 U. S. 608, l. c. 616, 617, 57 S. Ct. 549, 81 L. Ed. 835; State ex rel. Bluford v. Canada, 348 Mo. 298, 153 S. W. 2d 12, 13[8].

Petitioner has not established her right to the relief granted, to wit: the admission of ''petitioner forthwith to Harris Teachers College.'' The judgment should be and is reversed. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM: The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.