SIPUEL v. BOARD OF REGENTS OF UNIVERSITY OF OKLAHOMA et al.

No. 32756.   April 29, 1947.

Rehearing Denied June 24, 1947.

*180 P. 2d 135.*

Amos T. Hall, of Tulsa, and Thurgood Marshall and Robert L. Carter (Franklin H. Williams, of counsel), all of New York, N. Y., for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Fred Hansen, First Asst. Atty. Gen., and Maurice H. Merrill and John B. Cheadle, both of Norman, for defendants in error.

WELCH, J. Petitioner, Ada Lois Sipuel, a negro, sought admission to the law school of the State University at Norman. Though she presented sufficient scholastic attainment and was of good character, the authorities of the University denied her enrollment. They could not have done otherwise, for separate education has always been the policy of this state by vote of citizens of all races. See Constitution, art. 13 sec. 3, and numerous statutory provisions as to schools.

Since statehood, and for that matter in the two Territories prior to statehood separate schools have been systematically maintained and regularly attended by and for the races respectively. This policy has been established and perpetuated, and these schools have been so instituted and maintained by voters and taxpayers and educators and patrons of both races, as if for the greater good of both races in Oklahoma. So that, without regard to distances, conveniences or desires, or any other consideration, a negro child or pupil may not enter a white school nor a white child or pupil enter a negro school.

It is a crime for the authorities of any white school to admit a negro pupil, likewise a crime for the authorities of any negro school to admit a white pupil. 70 O. S. 1941, § 455. And it is a crime for any teacher in either such school to give instruction therein to pupils of the other race. 70 O. S. 1941, § 456. The law school of the University is maintained for white students and therefore the authorities and instructors thereof could not have enrolled and taught petitioner therein lest they suffer the criminal penalty therefor.

Petitioner's failure to obtain this enrollment was followed by this action in mandamus, seeking to compel the school authorities to admit and instruct petitioner, notwithstanding the force of the above laws. Serious questions arise as to the propriety of the remedy sought, but we prefer to discuss the merits of the rights claimed by petitioner.

There is no controversy as to the facts presented. Trial was had upon stipulation, not necessary to be copied herein at length, as parts relied upon will be discussed in order.

Petitioner contends that since no law school is maintained for negroes, she is entitled to enter the law school of the University, or if she is denied that, she will be discriminated against on account of race contrary to the 14th Amendment to the United States Constitution. This is specious reasoning, for of course, if any person, white or negro, is unlawfully discriminated against on account of race, the Federal Constitution is thereby violated. But in this claim for University admission petitioner takes no account, or does not take fair account of the separate school policy of the state as above set out.

That it is the state's duty to furnish equal facilities to the races goes without saying. The record would indicate the state has fully done so as to the lower grades, the high school, and as to general university training. It is a matter of common knowledge that for the past 50 years, ten years in the Territory and 40 years since statehood, Langston University (as it is now named), hereafter referred to as "Langston," has been and is now maintained for separate higher education of negroes, with large sums appropriated therefor and thereto by the State Legislature at each session and large sums allocated thereto by the State Regents for Higher Education. Oklahoma Constitution, art. XIII-A.

It is demonstrated by allegations of petitioner, and admission of answer and stipulation, that petitioner has in no manner been discriminated against as to lower grades, high school and pre-law college instruction, for petitioner specifically claims that she has fully completed all scholastic work required for pre-law and is therein as well qualified as any white student to study law. That is not controverted, but is admitted, and it is clear that petitioner attained such status in the separate schools of Oklahoma, including Langston.

Here we must notice the important point that it is not wholly clear whether petitioner seeks to overturn the complete separate school policy of the state, or seeks to compel equal facilities for the races by obtaining an extension of such facilities to include a separate law school for negroes. That point is made uncertain by the pleadings and brief of petitioner and by the stipulation. There is much to indicate petitioner does not assail and seek to destroy the entire separate school policy, and there is some statement to that effect by her or for her in the oral argument. But there is contradiction thereof in petitioner's brief.

There is an assumption or a charge in respondent's brief that petitioner does not desire the institution of a separate law school, does not desire to attend such a school, and would not attend same if it should be duly and adequately instituted. That assertion is not effectively or satisfactorily denied by petitioner since no reply brief was filed, the usual time for reply brief was allowed, and her position on the point is not made wholly clear in oral argument.

The authority of a state to maintain separate schools seems to be universally recognized by legal authorities. Missouri ex rel. Gaines v. Canada, 305 U. S. 337, 344, 83 L. Ed. 208, 59 S. Ct. 323; Plessy v. Ferguson, 163 U. S. 537, 544, 41 L. Ed. 256, 258, 16 S. Ct. 1138; McCabe v. Atchison, T. & S. F. Ry. Co., 235 U. S. 151, 160, 59 L. Ed. 169, 173, 35 S. Ct. 69; Gong Lum v. Rice, 275 U. S. 78, 85, 86, 72 L. Ed. 172, 176, 177, 48 S. Ct. 91.

In Bluford v. Canada, D. C., 32 F.

Supp. 707, 710-711 (appeal dismissed, 8 Cir., 119 F. 2d 779) it was said:

"The state has the constitutional right to furnish equal facilities in separate schools if it so desire. Plessy v. Ferguson, 163 U. S. 537, 16 S. Ct. 1138, 41 L. Ed. 256; McCabe v. Atchison, T. & S. F. Ry. Co. 235 U. S. 151, 35 S. Ct. 69, 59 L. Ed. 169. Absent notice and a reasonable opportunity to furnish facilities not theretofore requested, the state's right to follow its established policy is destroyed for reasons noted. Such a result should not be brought about absent an impelling necessity to secure to the citizen his or her constitutional rights.

"'We may add that while all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination against any class on account of their race, the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land.' Cumming v. Board of Education, 175 U. S. 528, loc. cit. 545, 20 S. Ct. 197, loc. cit. 201, 44 L. Ed. 262.

"Furthermore, if plaintiff may maintain this action without alleging previous notice of her desire and opportunity for compliance, will on tomorrow the individual members of the Board of Curators of Lincoln University or the University of Missouri be liable in damages to another negro, if, perchance, late today he or she demands instruction at Lincoln University for which facilities are lacking, and then in the morning demands admittance to the University of Missouri? Yet such would seem to be the result contended for by plaintiff unless the curators should maintain at Lincoln University at all times all departments of instruction, whether used or not, which are available at the University of Missouri. It does not appear that 'a clear and unmistakable disregard of rights secured by the supreme law of the land' would result from a failure on the part of those curators to keep and maintain in idleness and nonuse facilities at Lincoln University which no one had requested or indicated a desire to use.

"Since the state has made provision for equal educational facilities for negroes and has placed the mandatory duty upon designated authorities to provide those facilities, plaintiff may not complain that defendant has deprived her of her constitutional rights until she has applied to the proper authorities for those rights and has been unlawfully refused. She may not anticipate such refusal. Highland Farms Dairy v. Agnew, 300 U. S. 608, loc. cit. 616, 617, 57 S. Ct. 549, 81 L. Ed. 835. . . . "

We conclude from the over-all presentation that petitioner does not attack the separate school policy of Oklahoma, or if she does, the attack by this method is wholly without merit.

It would seem that petitioner's grievance is founded on the fact that the state has not established a law school for negroes at Langston or elsewhere in the state, assuming a desire on her part to attend such separate law school if it existed.

In response to such a claim or asserted grievance the respondents assert petitioner has never made a demand for the establishment of a law school for negroes, and it is stipulated no such demand has ever been made.

As we view the matter the state itself could not place complete reliance upon the lack of a formal demand by petitioner. We do not doubt it would be the duty of the state, without any formal demand, to provide equal educational facilities for the races, to the fullest extent indicated by any desired patronage, whether by formal demand or otherwise. But it does seem that before the state could be accused of discrimination for failure to institute a certain course of study for negroes, it should be shown there was some ready patronage therefor, or some one of the race desirous of such instruction. This might be shown by a formal demand, or by some character of notice, or by a condition so prevalent as to charge the proper offi-

cials with notice thereof without any demand. Nothing of such kind is here shown. It is stated in oral argument by attorneys for petitioner that so far as this record shows petitioner is the first member of her race to seek or desire education in the law within the state, and upon examination we observe the record is blank on the point. That is not important as being controlling of petitioner's individual rights, but it should be considered in deciding whether there is any actual or intentional discrimination against petitioner or her race.

If some specific course is now or should hereafter be offered to negroes in their University at Langston, but not at the same time made available in college courses for white pupils, would the state be guilty of discrimination for not offering such a course to white pupils before it knew of any white pupils desiring such particular instruction? And in such a case would the remedy of a white pupil be to demand and seek to force entry into Langston to get such instruction, or to let be known his desire to have instruction in such course in the school maintained for his race?

The State Regents for Higher Education has undoubted authority to institute a law school for negroes at Langston. It would be the duty of that board to so act, not only upon formal demand, but on any definite information that a member of that race was available for such instruction and desired the same. The fact that petitioner has made no demand or complaint to that board, and has not even informed that board as to her desires, so far as this record shows, may lend some weight to the suggestion that petitioner is not available for and does not desire such instruction in a legal separate school.

If the state in fairness to all taxpayers, and in good faith, deferred the installation of a law school for negroes, with its attendant expense, till at least some need therefor occurred, or was made manifest, it would hardly be fair for one of that race, refraining from demand or notice or information to that board, to take advantage of the situation then to choose a character of relief contrary to the lawful separate education policy of the state heretofore noticed.

Attention is called in the briefs to the fact that for a number of years the state, in lieu of a law school for negroes, has provided a fund whereby members of that race could attend law school outside the state, in law schools open to negroes, at expense of this state. Various members of that race have taken advantage of such opportunity, and several are now doing so. That plan does not necessarily discharge the state's duty to its negro citizen. See State ex rel. v. Canada, above cited. Negro citizens have an equal right to receive their law school training within the state if they prefer it. However, the above plan does not necessarily demonstrate a discrimination against negroes. Financial consideration, the saving to taxpayers, is not controlling, but is important to both races.

With both races believing in and practicing the policy of separate schools, it is possible that both races, including taxpayers and pupils of both races, might prefer the plan of furnishing education in law to negroes in established law schools outside the state, which are open to negroes, rather than the establishment of a separate law school in Oklahoma. It is certainly possible that negro pupils desiring to attend law school would prefer this provision for out-of-state study. If all negroes, qualified and desiring law school education, had such preference, then they surely could not contend that such plan would discriminate against them. That is, while the furnishing of such out-of-state education would not necessarily discharge the state's obligation to negro citizens eligible to study law, since we have the policy of separate education which is a lawful policy, the furnishing of out-of-the-state law education to negroes would free the state from any charge of dis-

crimination as long as both races preferred that plan to a separate law school in the state for negroes. Under these circumstances there is no more discrimination against negroes than there is in favor of negroes insofar as concerns their receiving law education in law schools outside of the state.

If a white student desires education in law at an older law school outside the state, he must fully pay his own way while a negro student from Oklahoma might be attending the same or another older law school outside the state, but at the expense of this state.

It is a matter of common knowledge that many white students in Oklahoma prefer to and do receive their law training outside the state at their own expense in preference to attending the University law school. Perhaps some among those now attending the University law school would have a like preference for an older though out-of-state school but for the extra cost to them. Upon consideration of all facts and circumstances it might well be, at least in some cases, that the negro pupil who receives education outside the state at state expense is favored over his neighbor white pupil rather than discriminated against in that particular.

While there is nothing in this record to show that this petitioner would prefer law education outside of the state under this plan, the record is equally blank as to any preference on her part for law instruction in a separate school in the state instead of such instruction outside the state, but at the expense of the state.

It seems clear to us that since our state policy of separate education is lawful, the petitioner may not enter the University Law Schools maintained for white pupils. Certainly she could not do so without a destruction of this state policy of separate education. She does not expressly claim any right to destroy this separate educational policy and, under the facts shown, no such right would exist if she did claim it.

It is equally certain, however, that petitioner is entitled to pursue her law studies and that without any unlawful discrimination against her. That is to say, she may not attend the law school for white pupils, for that would be unlawful and would involve illegal acts by herself, the authorities of the school, the instructors therein and the white pupils therein, but for emphasis we repeat that this does not change the fact that she is entitled at the expense of the state to pursue her studies in law and be educated therein. This she may do either in a separate law school to be established in the state, which, as we have shown, may well be done and for which authority already exists, or if petitioner acquiesces in the plan, she may have her education in law outside the state, but at the expense of this state.

As we have shown, for some years the state has followed the plan of financing out-of-state law education for negroes in place of a separate law school for negroes in the state. It is but fair to assume that such plan is both adequate and satisfactory, if not preferable, to negroes, at least until some character of showing is made to the contrary.

The petitioner places reliance upon the decision of the Supreme Court of the United States in Missouri ex rel. Gaines v. Canada, 305 U. S. 337, 83 L. Ed. 208, but between that case and this there are various distinguishing features both of law and of fact.

In Missouri, Lincoln University, maintained separately for negroes, occupies a position similar to Langston University in Oklahoma. Gaines was a graduate of Lincoln University as petitioner was a graduate of Langston. When Gaines applied to the law school of the University of Missouri, maintained separately for white pupils, his admission was denied, but he was advised to and did communicate with the authorities of Lincoln University. The opinion does not disclose the exact nature of his

42

communication or application to Lincoln University, but since Gaines was following through on his application for and his efforts to obtain law school instruction in Missouri, we assume he applied to Lincoln University for instruction there in the law. The authorities then, instead of making provision for petitioner's education in the law within the state, sought to discharge the obligation of the state by tendering Gaines instruction in law outside the state. In the case at bar no such application or notice of any kind was given by petitioner Sipuel to the authorities of Langston, or to the State Regents of Higher Education. Thus in Missouri there was application for and denial of that which could have been lawfully furnished, that is, law education in a separate school, while in this case the only demand or request was for that which could not be lawfully granted, that was education of petitioner, a negro, in a white school. Had this petitioner made application or given notice to those in charge of Langston, they had authority, and it would have been their duty, to provide for her an opportunity for education in law at Langston or elsewhere in Oklahoma.

As to distinguishing points in law we observe that in Oklahoma, but not in Missouri, there are specific statutes prohibiting education of whites and negroes together, and that a crime would be committed in Oklahoma, but not in Missouri, if whites and negroes were taught together, and apparently in Missouri, but not in Oklahoma, the authorities of the university for negroes have, or at that time had, a discretion to either provide educational facilities for negroes in Missouri or require negroes ready for higher education to attend schools outside the state. Also, that in Missouri the Constitution provided for separate public schools, but contained no express provision for race separation for the purpose of higher education. Furthermore, in Missouri the out-of-state education was restricted to states adjacent to Missouri, while, as heretofore pointed out, such out-of-state edu-

cation provided for Oklahoma negroes is not so restricted, the negro pupil here has complete freedom of choice, and it is a matter of common knowledge that Oklahoma negro students have attended schools in more than 20 states extending from New York to California, and including the Nation's Capitol.

This freedom of choice applying in Oklahoma and this wider use of our out-of-state privilege is not to be taken as a complete discharge of the state's obligation to negro pupils in higher education, but it is important in considering whether this plan might not be more desirable to all negroes than the maintaining of separate schools for their respective courses in Oklahoma, and might tend to justify the conclusion that such plan was and is wholly satisfactory to all negroes affected, until and unless there should be contrary showing or indication by demand or request or notice to the authorities in charge of higher education for negroes. This all leads to the conclusion that petitioner here could and should have presented some application or notice or information to those authorities as did the petitioner Gaines in Missouri.

The decision in the Gaines Case seems to have resulted from the failure and refusal of the proper authorities to make provision for the separate education of petitioner in law in Missouri after specific demand or application therefor, or at least the failure so to do after the authorities in charge of the school for higher education of negroes had specific notice that petitioner Gaines was prepared and available and therefore there existed a need and at least one patron for a law school for negroes.

The conclusion of the court in the Gaines Case is stated in these words near the end of the opinion:

". . . We are of the opinion that the ruling was error, and that petitioner was entitled to be admitted to the law school of the State University in the absence of other and proper provision for his legal training within the state."

There, as here, the petitioner could have no personal complaint as to the failure years ago to provide a law school for negroes long before petitioner was ready for such a course. So the "absence . . . of provision for his legal training within the state" noticed in the Gaines Case must have been the failure to provide same for him, Gaines, when he was ready for it and made known his desire and his availability. This he did when he made application to Lincoln University as above observed, but this the petitioner Sipuel wholly failed to do.

Therefore, there was not the same failure to provide as to petitioner Sipuel in Oklahoma as there was a failure to provide as to petitioner Gaines in Missouri. We are considering here not the political or economic question of the failure generally in years gone by to provide a law school for negroes. We are considering the question of the legal rights of petitioner herself to have such provision made for her, and, certainly, as to an individual and his or her rights, the court should not adjudge a failure to provide until there is some demand or notice or knowledge of desire and availability on the part of that individual. Apparently, petitioner Gaines in Missouri was seeking first that to which he was entitled under the laws of Missouri, that is, education in law in a separate school. Here petitioner Sipuel apparently made no effort to seek that to which she was entitled under the laws of Oklahoma, that is, education in law in a separate school, but instead sought only that to which she was not entitled under the law, that is, education in law in the school separately provided for white students.

Since there was not here the same failure to provide as in the Gaines Case, for lack of opportunity here to furnish provision in compliance with a request or expressed desire therefor, as existed in the Gaines Case, we do not believe that the rule of the Gaines Case is fully applicable here. The reasoning and spirit of that decision, of course, is ap-plicable here, that is, that the state must provide either a proper legal training for petitioner in the state, or admit petitioner to the University Law School. But the very existence of the option to do the one or the other imports the right or an opportunity to choose the one of the two courses which will follow the fixed policy of the state as to sep-arate schools, and before the courts should foreclose the option the oppor-tunity to exercise it should be accorded. That opportunity which was afforded by Gaines by his acts was denied by pe-titioner Sipuel here. The effect of her actions was to withhold or refrain from giving to the proper officials the right or option or opportunity to provide sep-arate education in law for her, as in-stead she proceeded immediately to of-fer herself for enrollment in the Univer-sity Law School for white students, and to insist upon that as her rightful remedy.

In State v. Witham, 179 Tenn. 250, 165 S. W. 2d 378, the Supreme Court of Tennessee held:

"Upon demand it is the duty of the board of education to provide negroes with equal facilities of instruction as those enjoyed by students of University of Tennessee, under statute, but the board is entitled to reasonable advance notice of their intention to require such facilities."

That same philosophy was applied by the Federal Court in Bluford v. Canada, supra, as shown in part by the previous quotation from that opinion. We now quote further therefrom as follows:

"The petition does not allege any de-mand by plaintiff or any other negro for instruction in journalism at Lincoln University, nor does the petition allege that the governing body of Lincoln Uni-versity had ample time to furnish those facilities after plaintiff first sought ad-mission to the University of Missouri. The omission is not inadvertent. On oral argument counsel, with complete frank-ness, stated plaintiff's position to be that although plaintiff should be the first to request the desired instruction

she is entitled to it at the University of Missouri instanter, if it be now furnished there to white students and is not immediately available at Lincoln University. If her position is well taken, no allegation of advance notice to the authorities of Lincoln University of her desire for the instruction demanded is necessary. On the other hand, if the state be entitled to an opportunity to furnish the instruction at Lincoln University before it or its administrative officers (such as the defendant) be convicted of violation of the equal protection clause, then the petition should be amended or defendant's motion sustained."

Then after discussion of the matter, including the reasoning first copied from this opinion, the court held the dismissal order would be sustained unless the amendment to petition should be made, thus fully approving the rule that the state is entitled to notice and an opportunity to furnish proper separate school education before one may claim a denial amounting to a discrimination.

In State ex rel. Bluford v. Canada, 348 Mo. 298, 153 S. W. 2d 12, the Supreme Court of Missouri held:

"A demand by negro on board of curators of state's university for negroes to open journalism department and such board's refusal to do so within reasonable time are prerequisites to issuance of writ of mandamus compelling state university registrar to admit such negro as student in state university school of journalism."

In the body of the opinion of that case it was said:

" It is the duty of this court to maintain Missouri's policy of segregation so long as it does not come in conflict with the Federal Constitution. It is also our duty to follow the interpretation placed on the Federal Constitution by the Supreme Court of the United State. The Supreme Court has many times approved the policy of segregation. Mr. Chief Justice Hughes, citing authorities, again approved the policy in the Gaines Case, provided substantially equal facilities for colored persons be furnished within the state. Since that opinion, Missouri, by legislative enactment, has ordered that equal facilities be provided within her borders and has designated the Board of Lincoln University as the proper authority to furnish such facilities. The duty of the Lincoln Board to open new departments on proper demand is now mandatory. True, the board cannot operate without funds. If its funds are insufficient to provide all courses taught at Missouri University, the board shall allocate its funds to the courses most needed. But that very fact entitles the board to have a demand made upon it before being required to open a new department, for surely the board is not required to maintain departments for which there are no students. We think also that the board is entitled to a reasonable time in which to open a new department after demand is made. If, upon proper demand, the Lincoln Board had refused to establish a course in journalism within a reasonable time, or had informed appellant that it was unable to do so, appellant would have been entitled to admission to that course in the Missouri University."

And further in the opinion it was said:

". . . Here, because of the lack of a previous demand on Lincoln University, appellant was not entitled to admission to Missouri University at the time of her application. . . . "

In petitioner's brief it is said:

"The Constitution and laws of the United States and State of Oklahoma require that equal facilities be afforded all citizens of the state. The duty of making such equal provisions was delegated to the Board of Regents of Higher Education. This duty is incumbent upon the board by virtue of their office. It was not necessary, therefore, that the plaintiff in error make a prior demand upon this board to perform its lawful duty before she may request mandamus to obtain her lawful right to a legal education.

"It is axiomatic that the law will not require an individual to do a vain and fruitless act before relief from a wrong will be granted. . . ."

It is then said by way of argument that any demand by petitioner would have been fruitless and vain. It is pointed out that the Regents of Higher Education had knowledge of this civil action after it was filed and that they met and considered "the questions involved" in the court action, but took no steps toward the setting up or operation of a law school for negroes in Oklahoma. There is a threefold answer to this argument. First, the petitioner had no right at all to anticipate refusal or denial of her demand, and, two, the petitioner has not as yet indicated her desire or willingness to attend a separate law school for negroes in Oklahoma, and third, "the questions involved" in this court action embraced only the claimed right of petitioner to enter Oklahoma University.

The above-quoted statement from petitioner's brief, however, does demonstrate acquiescence in the theory that in Oklahoma it is the fixed duty of the board to make provisions for higher education of negroes, different from the mere discretion to do so as was noticed in the Gaines Case and relied upon to support the conclusion there reached.

The Constitution of the United States is the supreme law of the land. It effectively p r o h i b i t s discrimination against any race and all state officials are sworn to support, obey and defend it. When we realize that and consider the provisions of our State Constitution and statutes as to education, we are convinced that it is the mandatory duty of the State Regents for Higher Education to provide equal educational facilities for the races to the full extent that the same is necessary for the patronage thereof. That board has full power, and as we construe the law, the mandatory duty to provide a separate law school for negroes upon demand or substantial notice as to patronage therefor.

We conclude that petitioner is fully entitled to education in law with facilities equal to those for white students,

but that the separate education policy of Oklahoma is lawful and is not intended to be discriminatory in fact, and is not discriminatory against plaintiff in law, for the reasons above shown. We conclude further that as the law in Oklahoma now stands, this petitioner had rights in addition to those available to white students in that she had the right to go out of the state to the school of her choice with tuition aid from the state, or if she preferred, she might attend a separate law school for negroes in Oklahoma. We conclude further that while petitioner may exercise her preference between these two educational plans, she must indicate that preference by demand or in some manner that may be depended upon, and we conclude that such requirement for notice or demand on her part is no undue burden upon her. We conclude that up to this time petitioner has shown no right whatever to enter the Oklahoma University Law School, and that such right does not exist for the reasons heretofore stated. We hold that this conclusion works no unlawful discrimination against petitioner, that she has not brought herself within the rule of the Gaines Case, and has wholly failed to establish any violation of the Fourteenth Amendment of the Federal Constitution.

The judgment of the trial court denying mandamus is affirmed.