**McSWAIN et al. v. COUNTY BOARD OF EDUCATION OF ANDERSON COUNTY, TENN., et al.**

No. 1555.

United States District Court
E. D. Tennessee, N. D.

April 26, 1952.

Z. Alexander Looby, Nashville, Tenn., Avon N. Williams, Jr., Carl A. Cowan, Knoxville, Tenn., Thurgood Marshall, New York City, for plaintiffs.

W. B. Lewallen, Sidney Davis, Clinton, Tenn., John T. Gilbertson, Knoxville, Tenn., for defendants.

ROBERT L. TAYLOR, District Judge.

The plaintiffs are Negroes, the infant plaintiffs, at the time the action was commenced, being students of high school age, all residing in Clinton, Anderson County, Tennessee. It is a suit for declaratory judgment, pursuant to 28 U.S.C. §§ 1343 (3), 2201 and 2202, and for an injunction restraining defendants from continuing alleged usage and customs which deny the student plaintiffs rights guaranteed to them under the equal protection clause of the Constitution of the United States, Amendment Fourteen, sec. 1, implemented by Title 8, U.S.C.A. §§ 41 and 43.

This was commenced as a class action under Rule 23, Federal Rules of Civil Procedure, 28 U.S.C., the named plaintiffs purporting to represent children of both high school and elementary grades. The original complaint alleged discrimination against Negro students of elementary grades, but this phase of the suit was abandoned, as indicated by statements of counsel for plaintiffs at the hearing. The action as it now stands relates to Negro students of high school grade residing in Clinton. It has not been pursued as a class action with respect to all Negro students of high school grade residing in Anderson County, the proof offered by plaintiffs being confined, except perhaps incidentally, to those Negro students who reside in Clinton. Any other approach would have been inconsistent with the theory upon which plaintiffs base their claim of unconstitutional discrimination. Their theory, incorporated in the words "similarly situated," refers not to other Negro students, but to white students who, likewise, live in Clinton. Inasmuch as it is not pursued as a class action, it will not be treated as one.

■ A number of motions were made prior to the hearing. Defendants Irwin and Brittain moved for dismissal as to them for failure to state a cause of action against them, and for failure to join an indispensable party defendant, the indispensable party referred to being the State of Tennessee. This motion was tentatively overruled, and is now finally overruled, for the reason that sec. 43, Title 8, U.S.C.A., operates upon persons, not upon the sources of their authority. Defendant school board also moved to dismiss for failure to state a cause of action and for designation of a nonexistant administrative board. The last named objection was cured by an amended complaint which correctly designated the board. As to whether the cause of action stated in the amended complaint was a tenable one was left to be determined pursuant to hearing.

The student plaintiffs are citizens of the United States and of the State of Tennessee. They are bona fide residents of Clinton. They are all within the statutory age limits for eligibility to attend public high schools and have satisfied all requirements for admission thereto. They are presently enrolled in a high school in Knox County which adjoins Anderson County. The adult plaintiffs are likewise citizens of the United States and of the State of Tennessee and bona fide residents of Clinton. They are taxpayers of Anderson County and of the State of Tennessee. They are either the parents or the guardians of the student plaintiffs and by state law are required to send the student plaintiffs to school. Tennessee Code, secs. 2442.1 and 2442.3.

As examination of the facts will show, this case is somewhat unique in its plaintiff viewpoint. Briefly stated, it is, that because the plaintiff students and some of Anderson County's white high school students reside in Clinton, they are similarly situated, by reason of which it is an unconstitutional discrimination against the Negroes to require them to attend a high school located outside of Clinton and in an adjoining county. Plaintiffs pin-point their case upon Clinton, and confine their proof to the effect of this alleged discrimination upon the Clinton Negroes. It is a situation that exists in hundreds of towns, in Tennessee and out, where Negro students who live near a white school must pass it by and go to a Negro school located at varying distances beyond, and it exists at all levels, from the elementary school to the college,

or university. This "similarly situated" theory is the doctrine of equal protection carried to its ultimate extreme. Counsel for plaintiffs deny they are attacking segregation of races, but in the situation here stated, their action, as will be seem from a review of the facts, can be nothing else.

In all of Anderson County, there are only thirty Negroes qualified for high school attendance. Before an accredited high school can be established in the State of Tennessee, it must have an average daily attendance of seventy-five. Code sec. 2393.7. Establishment of a separate, accredited high school for Negroes in Anderson County, therefore, is beyond legal possibility because of the cited statute. In Tennessee, also, white and colored children are required by law and by the state constitution to attend separate schools. Art. 11, sec. 12, Constitution of Tennessee; Code secs. 2377 and 2393.9. When the student plaintiffs sought admission to Clinton High School, which is a school for white children, the defendants were in effect asked to violate the constitution and statutes of Tennessee, for admitting the Negro students would have amounted to that.

Prior to this incident, defendants had arranged for the Negro high school students to attend a high school for Negroes at La-Follette, in the adjoining county of Campbell. This is an accredited high school with a class "C" rating, whereas Clinton High School has the higher class "A" rating. Subsequent to the application and refusal with respect to Negro attendance at Clinton, defendants made arrangements for Negro high school students of Anderson County to attend Austin High School for Negroes, at Knoxville, in the adjoining county of Knox. Austin High School has an "A-1" rating, which is higher than the "A" rating which Clinton has.

In this situation plaintiffs have no ground for complaint, in so far as equal educational opportunity goes, and it is doubtful that they feel aggrieved. Those of plaintiffs who have appeared in court in this case represent an excellent type of citizenship. There was no hint of racial hostility or ill-will on either side and there is no reason to believe that this lawsuit stems from a feeling of very deep grievance upon the part of plaintiffs.

This aspect of the case is illustrated by the following colloquy which occurred during the cross-examination of Helen Jarnigan, a Negro student of Anderson County who rides to Austin High School in a bus furnished by the defendants:

"Mr. Lewallen: Are you happy in Austin High School? A. Yes.

"Q. You like your fellow students there? A. Yes.

"Q. You enjoy the school? A. Yes.

"Q. Is it your desire to go to the Clinton High School?

"Mr. Looby: Just a minute

"Mr. Lewallen: Near your home?

"Mr. Looby: I think her desire has nothing to do with it.

"The Court: Do you object?

"Mr. Looby: Yes.

"The Court: Overruled.

"Mr. Lewallen: Is it your desire, Helen Ann, as a student—

"Mr. Looby: We except, if your Honor please.

"The Court: All right.

"Mr. Lewallen:—to attend at Clinton High School that is now in operation down below your home?

"Mr. Cowan (of counsel for plaintiffs): May it please the Court, this is not a party plaintiff. She is a witness.

"Mr. Lewallen: This is cross-examination.

"Mr. Looby: Her desire, if it were one of the plaintiffs, it might be material, but as to what she desires—

"Mr. Lewallen: She is a member of the class.

"The Court: She is a member of the class. I overrule the objection, gentlemen.

"Mr. Looby: All right, we except.

"Mr. Lewallen: Will you answer my question?

"A. Well, it doesn't matter as far as going to school there, I would like

to go to school because it doesn't matter about the races because they are human just like I am, and it would be close and more convenient.

"Q. You say you are happy at Austin High School?

"Mr. Looby: I withdraw my objection, your Honor.

"The Witness: As far as the school is concerned, it makes it inconvenient for me, but I am happy as far as the school is concerned.

"Q. If you lived at Clinton and attended Clinton High School which is now in operation there, you would have no inconveniences? A. No. Not as much so as I do now.

"Q. Is it your desire to enroll in Clinton High School? A. It doesn't matter.

"Q. It doesn't matter? A. No.

From the whole record in this case, of which the foregoing excerpt is illustrative, it is hard to avoid a conclusion that the student plaintiffs are not aggrieved at present arrangements. Nor are they happy in their role of hostility toward defendants, who are their neighbors and personal friends. From the point of view of counsel for plaintiffs, how the plaintiffs may feel about the situation "has nothing to do with it."

The student plaintiffs reside in Clinton, within walking distance of Clinton High School. They are given free transportation by bus from Clinton to Austin High School, a school for Negroes in Knoxville, 19 miles from Clinton. Their tuition in Austin High School is paid by Anderson County. Their bus leaves Clinton about 7:30 a. m. and arrives at Austin High School about 40 minutes later. The bus is practically new, is cleaned regularly, has a capacity of 36 passengers, and hauls on the average about 22 students, all of whom, of course, have seats.

Clinton High School, whose building was originally intended to accommodate 175 students, actually accommodates about 600. A large proportion of the 600 are brought to Clinton by buses, some of which have a round-trip of 65 miles. Many of the white high school students catch their buses before 7:00 o'clock, some as early as 6:40. Some of these have lay-overs at intervening elementary schools, where they wait while their buses make side trips to collect other students, the result being that an hour or more is required to make the trip from home to school.

The Negro plaintiffs say that defendants do not provide them with roadside shelters. It is equally true that no shelters are provided for white students. The Negro plaintiffs say that their bus is dirty and that by reason thereof they have rather large cleaning bills. Yet the white students ride similar buses and their cleaning bills presumably would be comparable to those of plaintiffs. The Negro plaintiffs say that they have to get up earlier in the mornings than they would have to get up if they went to school in Clinton. They give their getting-up time as about 5:30 for the mothers and from 5:30 to 6:30 as getting-up time for the Negro children. Representative white high school children get up at 5:30 and leave home at 6:40 to 6:55. The Negro students say that, because they have to catch their bus for home after school, they are unable to engage in after-school activities, such as football and basketball. Buses do not stay after school to accommodate white children, but those who are determined to participate in after-school activities provide their own transportation home. For instance, one white boy who plays football testified that he sometimes walks home, a distance of 6½ miles.

There is no complaint that Austin High School is inferior to Clinton High School. Indeed, the proof shows that on the whole Austin is the better school. It offers a number of courses presumably of especial value to Negro students which are not offered at Clinton. It is less crowded than Clinton. It has a school cafeteria, whereas Clinton has had to give up its cafeteria in order to use the space for a classroom. Clinton has a Class "A" rating with the State, whereas Austin has a Class "A-1" rating, which is higher than Class "A". Austin is a member of the Southern Association of Secondary Schools and Colleges; Clinton is not. The per capita cost of sending a white student to Clinton is $120. The

per capita cost of sending the plaintiff Negroes to Austin High School is $325. All things considered, the Negro students have available to them an educational opportunity which is superior to that available to white students at Clinton. In addition, Austin High now has under construction a modern high school building which will be ready for use when the 1952 fall term of school convenes. The building now being used by high school students will then be used by elementary students.

The inconveniences complained of by plaintiffs upon close examination appear quite insubstantial. The testimony of Mrs. McSwain, one of the adult plaintiffs, is illustrative. She said she had to get up at 5:30 when her daughter Joheather (through high school now, and no longer a plaintiff) was riding a bus to school. Following is her testimony on this point:

"Mr. Lewallen: I believe you testified, did you not, that you got up around six o'clock in the morning or 5:45 when your daughter was going to Austin High School in Knoxville?

"Mrs. McSwain: 5:30.

"Q. 5:30? A. 5:30.

"Q. What time did you get up, say this morning? A. This morning I was up at six o'clock.

"Q. What time do you normally get up on all occasions? A. Well, all the way from 5:30 to 6:00.

"Q. * * * The fact that she is not in high school or none of your children are in high school is not determinative of the time you personally get up, is it, Mrs. McSwain? A. No, but I have other children in grammar school that I have to get up just the same.

"Q. Have to get up at the same time? A. Yes, sir.

"Q. Those children that you have in the elementary school, you say you get up at this same time for they are in the elementary school at Clinton? A. That's right.

"Q. So the fact that you had a daughter going to Knoxville to Austin High School then didn't determine your way of getting up or time of getting up? A. Well, in a way it didn't and in another way it did, because I *had* to get up at 5:30. Well, now I really don't *have* to get up at 5:30 now, but I do just the same."

The getting-up time at the home of Helen Jarnigan, heretofore mentioned as a witness for plaintiffs and a Negro who attends Austin High School from Clinton, shows up on analysis in a somewhat different light. She admits that she leads a more luxurious life than some of the other Negro students. While her mother gets up at 5:00, she stays in bed until 6:30, her breakfast being prepared for her by her mother. She testified that if she were going to school in Clinton, she would not have to get up until 7:30.

It is shown that the bus for Austin High School leaves Clinton about 7:30. In order for this student to catch the 7:30 bus, she has to get up at 6:30 and her mother has to get up at 5:00. But it appears that her father, who is employed in the section department of the Southern Railway, has to be at his job at 7:30. Yet it is not explained whether Mrs. Jarnigan gets up at 5:00 in order that her daughter Helen can catch the school bus at 7:30, or that Mr. Jarnigan can be at his job at 7:30.

When counsel for defendant called for names of other negro students who ride buses to Austin High School, counsel for plaintiffs objected, and the following colloquy occurred:

"Mr. Lewallen: Your Honor, I just want to show that the activities and the inconveniences which Miss Jarnigan is experiencing to get an education is incident to all people getting an education. I think we are entitled to show, your Honor, for comparison purposes.

"Mr. Looby: If your Honor, please, I don't think it will be relevant to show the inconvenience of someone who may be experiencing it in some remote or unconnected area. The only thing relevant is to students from Clinton as to whether their condition exists as to white and colored students in Clinton, Tennessee. That is all we are talking

about. That is all this case is about. It may be that somebody in West Tennessee whose experience is not only more difficult, and Washington had to walk miles to get to school. But that has nothing to do with this case."

What it is that has to do with this case is to be gleaned from a 325-page transcript of testimony, plus a number of stipulations. Reduced to its lowest possible terms, what has to do with this case is this: In Clinton, Tennessee, there is a high school for white students, but no high school for Negroes. The Negro students, in order to have the advantage of a high school education, are transported to a Negro high school in another county. This, the plaintiffs claim, is a denial to them of that equal protection of the laws guaranteed to them by the Fourteenth Amendment. Even though they attend a superior high school and are happy in their present situation, that, it is insisted by counsel for plaintiffs, has nothing to do with anything. Defendants, it is insisted, should be enjoined from continuing this practice of inequality.

But this transcript shows that there are only three high schools in Anderson County and that of the 1169 white high school students who attend these schools, a very large proportion are transported in school buses to one school or another. In many of the buses that have a seating capacity of 48, passengers number as high as sixty, which means that some must stand. Moreover, 118 white high school children of Anderson County are attending high schools outside Anderson County, being required in many cases to do so by the school authorities, who furnish transportation and tuition for them to and in adjoining counties. This inter-county school attendance is authorized by statute and is not a county-inspired arrangement. Code secs. 2393.15 and 2472.

Nor do the high schools of Anderson County offer identical courses. All adhere to the standard curriculum, by necessity, but courses that offer special opportunities are present in some and absent in others. From a purely academic standpoint, all of this presents a situation of discrimination and inequality, of which probably more than half of the white students of the county might have reason to complain. But is it a denial of the equal protection of the laws?

Section 1 of the Fourteenth Amendment is as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In this action no attempt was made by plaintiffs to make the State of Tennessee a party defendant, though the quoted section of the Fourteenth Amendment operates upon States. Plaintiffs are proceeding under 8 U.S.C.A. §§ 41 and 43, which operate upon individuals. Defendants have insisted that the State is an indispensable party. While the Court, as heretofore indicated, does not agree with this insistence, it is apparent that what has occurred in Anderson County in this school situation stems from the power, authority and prohibitions of the State. This is a matter of concern to every county in the State, and to the State itself. Obviously it was more advantageous to plaintiffs to treat Anderson County as if it were a state, having a state's autonomy within the federal union. It could thus be put in the position of having required its Negro students to go outside of autonomous boundaries in order to attend school. When a state did that, though the state provided equal facilities in another state, it was long ago condemned as a denial of equal protection. Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 437. Here is Anderson County, so it would be made to appear, an autonomous political unit, a state within a state, which is sending its Negro students into an adjoining autonomous political unit.

But the Court must reject any theory that what is being done, is being done by a county.

Section 12 of Article XI of the Constitution of Tennessee provides:

"Knowledge, learning and virtue, being essential to the preservation of republican institutions, and the diffusion of the opportunities and advantages of education throughout the different portions of the State being highly conducive to the promotion of this end, it shall be the duty of the General Assembly, in all future periods of this Government to cherish literature and science."

The Code of Tennessee contains the following pertinent provisions:

"Section 2306. System of public education.—There is established a system of public eduction."

"Section 2307. Administered by whom.—The system of education shall be administered by (1) the commissioner of education, (2) the state board of education, (3) the county superintendents, (4) the county and city boards of education."

"Section 2308. Divisions of department of education.—The department of education is composed of the following divisions:

"1. Elementary schools, the head of which shall be the supervisor of elementary schools.

"2. High schools, the head of which shall be the supervisor of high schools.

"3. Certification, the head of which shall be the supervisor of certification.

"4. Vocational education, the head of which shall be the supervisor of aggricultural education.

"5. Vocational rehabilitation, the head of which shall be the supervisor of the vocational rehabilitation.

"6. Library and archives, the head of which shall be the librarian and archivist.

"7. Registration, the head of which shall be the registrar of professions and trades."

"Section 2309. Department's offices, powers, duties.—The department of education shall have its offices in the state capitol and its commissioner shall be vested with such powers and required to perform such duties as are set forth in this law and shall be charged with the administration of such laws as the legislature from time to time may enact."

"Section 2314. Commissioner is chairman of board; special duties enumerated.—The commissioner shall be, ex officio, member and chairman of the state board of education, and shall have a vote on all questions coming before the board, and it shall be the duty of said commissioner of education.

"(1) To appoint all heads and subordinates in the department and divisions thereof, except supervisor of agriculture, supervisor of trades and industry, supervisor of home economics, supervisor of rehabilitation who shall be elected by the state board of education, who shall fix their compensation subject to the approval of the federal board, if required, except teachers and other county school officers. All appointments made by the commissioner shall be made subject to the governor's approval.

"(2) To collect and publish statistics and other information relative to the public school system.

"(3) To make tours of inspection and survey among the public schools throughout the state and to direct supervision through the divisions of the department.

"(4) To require all teachers to attend county institutes or educational meetings on the date at the hour and place designated by the county superintendent; provided, schools shall not be suspended for more than ten days in one year, and, provided further, that the place of such meeting shall be in the county where the school is located.

"(5) Laws and regulations executed. —To see that the school laws and the

regulations of the state board of education are faithfully executed. * * *

"(10) To fix the dates and places for conducting the examination for teachers, principal, and supervisors, and prescribe rules governing the same, and issue certificates of qualification to applicant entitled to same. * * *

"(14) To prepare and furnish suitable certificates of promotion for pupils completing the eighth grade of the elementary schools, and two year high schools, and diplomas for graduates of the four year high schools. * * *

"(18) To supervise county high schools and to furnish blank forms in accord with the provisions of this statute."

█ In the Code are many other sections relative to creation, powers and duties of a state board of education, county boards of education, and county superintendents, qualifications of various school officials, superintendents, supervisors and teachers, the creation of an equalization fund, distribution of the fund to counties, supervision of school funds, duties of and restrictions upon teachers. From all of the laws contained in the Code it appears beyond peradventure that the program of education in Tennessee is a state, and not a county, function. That these laws are reflected on the practical side is borne out by the evidence. As to Clinton High School, the state provides three-fourths of the expense of its operation and maintenance. The state pays the salary of Superintendent Irwin. The state pays the salaries of the high school teachers. The state fixes the qualifications of the superintendent and the teachers. The state supervises the school, rates the school, and, along with other high schools, fixes its minimum curriculum.

█ Nor is determination of policy with respect to races a county function. Custom and usage, as here complained of, have their origin in the state's constitution and laws.

Section 12 of Article XI of the Constitution of Tennessee provides in part:

"* * * No school established or aided under this section shall allow white and negro children to be received as scholars together in the same school."

Sections of the Code provide:

"Section 11395. Unlawful for white and colored persons to attend same school.—It shall be unlawful for any school, academy, college, or other place of learning to allow white and colored persons to attend the same school, academy, college, or other place of learning.

"Section 11396. Unlawful for teacher to allow such mixed attendance or to teach them in same class.—It shall be unlawful for any teacher, professor, or educator in any college, academy, or school of learning, to allow the white and colored races to attend the same school, or for any teacher or educator, or other person to instruct or teach both the white and colored races in the same class, school, or college building, or in any other place or places of learning, or allow or permit the same to be done with their knowledge, consent, or procurement.

"Section 11397. Violation is a misdemeanor; fine and imprisonment.— Any person violating any of the provisions of this article, shall be guilty of a misdemeanor, and, upon conviction, shall be fined for each offense fifty dollars, and imprisonment not less than thirty days nor more than six months."

█ The sections of the state constitution and laws last above quoted effectuate what is commonly known as segregation in schools. The purpose is separation, segregation being the result. It is to be observed that the separation provisions are not discriminatory, but in theory operate upon all races alike. They are not violative of the equal protection provision of the Fourteenth Amendment, and separation laws which do not in practice deny equal protection are not unconstitutional.

Missouri ex rel. Gaines v. Canada, 305 U. S. 337, 59 S.Ct. 232, 83 L.Ed. 437; Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172; McCabe v. Atchison, T. & S. F. Ry. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256.

■ While the Fourteenth Amendment is the federal safeguard against denial of equal protection with respect to educational opportunity, it is recognized that education of citizens within the state is a state, and not a federal function, "and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land." Cumming v. Richmond County Board of Education, 175 U.S. 528, 545, 20 S.Ct. 197, 201, 44 L.Ed. 262. "The right and power of the state to regulate the method of providing for the education of its youth at public expense is clear." Gong Lum v. Rice, 275 U.S. 78, 85, 48 S.Ct. 91, 93, 72 L.Ed. 172.

Plaintiffs declare that they are not questioning the constitutionality of segregation. Their insistence is, however, that plaintiffs should be furnished facilities for high school education within the town of Clinton equivalent to those furnished to white children there. As such separate facilities do not now exist, counsel for plaintiffs insist that the Negro students in Clinton should "for the present" be admitted to the white high school. Admission "for the present" would amount to an order for permanent admission, because of the circumstances heretofore pointed out with respect to Negro population. The Court is not asked to declare segregation in schools unconstitutional, but it is asked to do indirectly what it is not asked to do directly.

■ As their justification for this insistence, plaintiffs say they and the white students of Clinton are similarly situated. They are similarly situated in that they are eligible for high school attendance and live in the same town. But the status of being similarly situated cannot be defined in terms of school standing and residence alone. Equality of opportunity cannot in practice be measured in terms of place, for opportunity rather than place is the heart of equal protection. Gong Lum v. Rice, 275 U.S. 78, 84, 48 S.Ct. 91, 72 L.Ed. 172; Trustees, Pleasant Grove Independent School Dist. v. Bagsby, Tex. Civ.App., 237 S.W.2d 750.

In Briggs v. Elliott, D.C., 98 F.Supp. 529, at page 535, vacated and remanded for incompleteness, 342 U.S. 350, 72 S.Ct. 327, the court, Parker, Circuit Judge, said:

"The problem of segregation as applied to graduate and professional education is essentially different from that involved in segregation in education at the lower levels. In the graduate and professional schools the problem is one of affording equal educational facilities to persons sui juris and of mature personality. Because of the great expense of such education and the importance of the professional contacts established while carrying on the educational process, it is difficult for the state to maintain segregated schools for Negroes in this field which will afford them opportunities for education and professional advancement equal to those afforded by the graduate and professional schools maintained for white persons. What the courts have said, and all they have said in the cases upon which plaintiffs rely is that, notwithstanding these difficulties, the opportunity afforded the Negro student must be equal to that afforded the white student and that the schools established for furnishing this instruction to white persons must be opened to Negroes if this is necessary to give them the equal opportunity which the Constitution requires.

"The problem of segregation at the common school level is a very different one. At this level, as good education can be afforded in Negro schools as in white schools and the thought of establishing professional contacts does not enter into the picture. Moreover, education at this level is not a matter of voluntary choice on

the part of the student but of compulsion by the state. The student is taken from the control of the family during school hours by compulsion of law and placed in control of the school, where he must associate with his fellow students. The law thus provides that the school shall supplement the work of the parent in the training of the child and in doing so it is entering a delicate field and one fraught with tensions and difficulties. In formulating educational policy at the common school level, therefore, the law must take account, not merely of the matter of affording instruction to the student, but also of the wishes of the parent as to the upbringing of the child and his associates in the formative period of childhood and adolescence. If public education is to have the support of the people through their legislatures, it must not go contrary to what they deem for the best interests of their children."

Plaintiffs here, of course, would reject any argument based upon the problems which have prompted separation provisions in state constitutions and laws. They recognize that separation laws exist, but hold to the view that they ought not to exist where they result in inconveniences to a segregated race. They rely in particular on Corbin v. County School Board of Pulaski County, Virginia, 4 Cir., 177 F.2d 924, and Carter v. School Board of Arlington County, Virginia, 4 Cir., 182 F.2d 531. In the case here, the complaint centers around the requirement that Negro students attend a Negro high school located in an adjoining county, an arrangement which involves transportation of 19 miles each way. In the Corbin case, where denial of equal protection was found, transportation to a school in another county was a matter complained of, and the court enumerated the matter of transportation as one of the elements of inequality of treatment. But it was only one of numerous elements, and by no means the controlling one. In both the Corbin and the Carter cases a comparison of the school facilities themselves showed a lack of Negro facilities substantially equivalent to those of white students. But here the facilities furnished the Negro students in an adjoining county are not only substantially equal, but are substantially superior to those furnished to white students, and travel is over a fine highway in a new bus a distance of 19 miles in a travel time of only 40 minutes. According to the testimony of J. W. Barksdale, Commissioner of Education for Tennessee, and of Harry Carter, an executive assistant to the Commissioner, it is not uncommon in Tennessee for students of high school grade to attend school in a county other than that of their residence; nor is travel by bus a distance of 19 miles an unreasonable travel requirement. The Court shares their opinion. It is also the Court's opinion that inconveniences complained of by plaintiffs are insubstantial and that on the whole the student plaintiffs are enjoying educational opportunities that are not inferior, but are superior to those of white students who attend Clinton High School.

■ Separation of races in the public schools is a fact established by statute in Tennessee, as it is in about one-third of the other states. These states consider separation not only a wise, but also a necessary policy for the best interests of the races. The viewpoint represented by the Negro plaintiffs would require a high price for maintenance of the separation policy. That price would be establishment of a Negro school in proximity to every white school, or vice versa, that is, a duplication of school facilities at every level of education, if there are Negroes or whites similarly situated. Such duplication, of course, would break the back of public education in Tennessee.

But the alternative suggested by this case cannot be accepted as the price of separation. It ignores the real substance of opportunity. The Fourteenth Amendment is recognized by all as an esteemed landmark on the road to human freedom, but courts have not construed and applied it with the ruthlessness of a headsman's axe. In recognizing that public education is a state responsibility, they have recognized also that the responsibility is not an easy one. In spite of the extra effort and

extra expense involved, the State of Tennessee through its servants, the Anderson County defendants, is not only trying, but is succeeding in its effort, to furnish these Negro students educational advantages equal to those furnished to white students. The riding of a bus by the student plaintiffs is a small contribution upon their part and that of their parents toward the success of this effort, too small to be regarded as a denial of constitutional rights.

The result is, that the relief sought by plaintiffs must be denied and the action dismissed.

Let an order be prepared.